HIGGINS, Justice.
 

 This is an action by the fee-simple title owners of eighty acres of land and of the greater portion of the mineral royalty rights therein, for the cancellation of oil and gas leases on the ground that the corporation which drilled a large well productive of gas, about two years before the suit was filed, failed in its contract obligations to market the product of the well and thereby abandoned and forfeited the leases and the well in favor of the plaintiffs as lessors. They also claim the sum of $54,600 as damages, representing the amount it is alleged they would have received in royalties if the well had been operated with diligence by the defendants, in accordance with their obligations.
 

 The defense interposed is that the defendants were specifically granted the right by the contracts under the facts and circumstances presented to postpone the development and the operations in and around the well upon the'payment of certain cash amounts, which payments were made to the lessors.
 

 The trial judge rendered judgment in favor of the plaintiffs and against the defendants as prayed for, except that he fixed the damages at the sum of $5,328.35.
 

 The defendants appealed and the plaintiffs have answered the appeal asking that the amount of the award of damages be increased to the sum of $16,000.
 

 The 80-acre tract of land in question is owned by the widow and heirs of the late W. B. Causey, who granted a mineral lease to the Arkansas Louisiana Pipe Line Company, the predecessor of the Arkansas Louisiana Gas Company, in 1931, on Louisiana form Nó. 10, for the primary term of five years, provided that, if there were no operations thereunder, acreage rentals of $1 per acre, or the sum of $80 was to be paid annually to the lessors. In 1936 the plaintiffs, as the lessors, signed separate renewal leases or new contracts, all of which, for, the purpose of this case, were identical, except as to the depository for the rental payments. No operations were carried on during the term of the original lease, but the acreage rentals were paid annually by the
 
 *106
 
 lessees and a few months before the expiration of the lease, the Arkansas Company secured from the widow and the heirs (then co-owners), the renewal or extension agreements. E. W. Causey, one of the heirs, executed a lease on February 15, 1936, to the Arkansas Company, and another lease to George J. Greer, in June 1937, both of which were assigned to the Arkansas Company on July 1,1937. In April, 1936, a well was drilled to a depth of 4,687 feet, or beyond the depth- of 4,500 feet, as required by the provisions of the renewal leases, and was thereafter plugged and all the machinery moved from the leased premises, 'the attempt to find oil or gas having been unsuccessful. The payment of acreage rentals was then resumed by the Arkansas Louisiana Gas Company, which, at that time, was the owner of the whole project through its corporate predecessor. Shortly thereafter, the American Liberty Oil Company of Dallas, Texas, became the assignee of the Arkansas Company of an undivided one-half interest in the various leases and Up to the present time the ownership of the leases and .the well by the two corporations has continued. In the fall of 1937, the American Liberty Oil Company undertook the deepening or redrilling of the original well and completed it at a depth of 5,800 feet on September 6, 1937. On September 13, 1937, a test was made by the Conservation Department’s representative, which showed a well having an open flow of 34,903,000 cubic feet of gas per day and a rock pressure of 2,134 pounds per square inch. The well also produced a considerable quantity of salt water and it was capped and no gas was thereafter obtained from it. About four months after the completion of the well, the lessors began to demand that the lessees connect the well with a line and produce and market gas therefrom and that they (the lessors) be given domestic gas in the dwelling on the premises. The Arkansas Company had a main 20-inch gas line, extending from Monroe to Shreveport, connected to its general system and this main line was within about three miles of the Causey property. The line was in existence before the well was drilled and has been used to transport gas continuously up to the present time, but not from the Causey well. The Arkansas Company owns no line from the Causey well to the main pipe line and the American Liberty Oil Company does not own any pipe line. The defendant Arkansas Company had drilled other wells and laid other pipe lines to them, and had bought and marketed some gas since the date the Causey well was completed. The extent o.f the Arkansas Company’s markets and the status of its investments in various other fields from which it takes gas is not brought out clearly.
 

 It appears that the well would have been .connected to the pipe line had it not been for the presence of a copious amount of salt water in the well estimated to be 1,000 gallons per day when the well was fully opened. Due to this condition, the responsible supervisory representatives of the defendants state that any attempt to operate the Causey well alone, under these circumstances, would be wholly uneconomic because it would necessitate the employment .of workmen to have charge of the well twenty-four hours per day, the installation of expensive equipment consisting of large
 
 *108
 
 separators and traps, and the building of a pipe line from the well to the main line about three miles away, all of which would make the operation of this one well a losing financial proposition. These witnesses stated that if other gas wells were devel- . oped in the field, this would change the situation from an uneconomic undertaking to a profitable one.
 

 The geologist’s' information obtained from drilling the Causey Well No. 1, which cost $62,500, revealed that it would be undesirable and unprofitable to drill other gas wells on this 80-acre tract of land, but that the company had other holdings in that vicinity and was considering drilling operations thereon. However, the exact or definite time for such new undertaking was not known.
 

 The defendants also introduced evidence tending to show that some gasoline was being produced from the well and that separators or traps would be inadequate to protect the gas lines from being occupied with gasoline and salt water, unless a gasoline plant was erected and that this would involve a minimum expenditure of about $150,000.
 

 The geologist of the Arkansas Company testified that the Causey well is situated in “semi-wildcat” territory; that if any company had sufficient need for gas and enough leases, it would probably consider the location as attractive territory for exploration; and that he could not recommend the drilling of a particular well as an investment, because there was no assurance that sufficient gas would be obtained from the well to repay the cost of such drilling.
 

 A witness for the plaintiffs states that it. would take six months’ time to obtain a right-of-way from the landowners for the-construction of a pipe line from the well, to the company’s main line. His testimony is uncertain as to whether he meant that six months would be required for obtaining' the right-of-way as well as the laying of the-pipe line and making the necessary connections.
 

 After the completion of the well in September, 1937, the defendants regularly deposited to the credit of the respective lessors or their assigns their pro rata share-of the $200 per annum, under the royalty -clause (No. 2) of the lease, in the Monroe-bank designated by the contracts, with the-exception of the amount due the plaintiff, Mrs. Allie B. Goss, whose lease provided, that the payment due her be deposited ifi theRuston State Bank & Trust Company.
 

 The plaintiffs have not accepted the rentals since they demanded that the defendants produce gas from the well, or surrender the lease and forfeit the well.
 

 It is the contention of the plaintiffs that,, under a fair and reasonable construction, of the provisions of the leases, once gas. was discovered, the lessees must exercise reasonáble diligence to produce and market the gas, citing the following clauses of the. leases:
 

 “* * * has granted, demised, leased and let and by these presents does grant,' demise, lease and let unto lessee, for the sole and only purpose of mining and operating for oil and gas * * *.
 

 * * * * *
 

 
 *110
 
 “ * * * Notwithstanding anything in this lease contained to the contrary; it is expressly agreed that if lessee shall commence drilling operations at any time while this lease is in force, this lease shall remain in force and its term shall continue so long as such operations are prosecuted and, if production results therefrom, then as long as such production continues.
 
 $1
 
 #
 
 *
 
 »
 

 “ * * * It is provided however that unless Arkansas Louisiana Gas Company commences the drilling of a well upon said land or at a location within 5 miles of some part thereof, on or before the 15th day of April 1936, the lease herein referred to shall, ipso facto, terminate and be at an end. Such drilling operations after commencement shall be diligently prosecuted, in a bona fide attempt to find and produce oil or gas, to a depth of 4500 feet.”
 

 The defendants contend that the evidence shows that the companies exercised due and reasonable diligence to find and produce oil and gas, in accordance with the contracts, and that the unusual circumstances in the case justified and entitled the defendants to pay the lessors the $200 per year “for each producing gas well until the gas could be utilized and sold,” relying upon the following provision of the leases:
 

 “2nd. To pay the lessor two hundred dollars each year for each well producing gas only until such time as the gas shall be utilized or sold off the premises, and at that time the royalty above named shall cease, and thereafter the grantor shall be paid one-jeighth (%) of the value of such gas calculated at the rate of * * * current market value * * * cents per thousand cubic feet, corrected to two pounds above atmospheric pressure, * * *.”
 

 Defendants are not taking the position as stated by the plaintiffs that they can permanently and indefinitely continue the payment of $200 per year, without making any effort to utilize and sell the gas from the well, but urge that, under the facts and circumstances of this case, they have not been lacking in diligence nor have they been guilty of undue or unreasonable delay in not connecting the well to the pipe line in order to sell the gas, as the unusual situation presented requires time, effort and money to secure other production which will bring about a solution of their involved" problem.
 

 As we view the case, the provisions of the leases upon which the defendants rely modify the provisions of the leases upon which the plaintiffs stand. A producing gas well has been discovered and the plain language of the specific clause required the lessees to pay the lessors $200 per year for each well producing gas, only “until such time as the gas shall be utilized or sold off the premises.” All of the plaintiffs, except Mrs. Goss, recognized the pertinence of this clause because they accepted their pro rata of the $200 payments with the exception of the last one. The plaintiffs’ witnesses also testified that the purpose of this clause in the lease was to give the lessees reasonable opportunity to secure the right-of-way for the laying of a pipe line and connecting it to the main line, in order that the gas could be marketed when a market
 
 *112
 
 therefor was available. These witnesses also say that these provisions are designed to give the lessees the right to defer connecting the well to a pipe line for a period of time, the length of which depends upon all of the circumstances.
 

 The testimony offered by the defendants shows that this gas well is producing a large volume of salt water and some gasoline and that separators and traps would be inadequate to eliminate the presence of these undesirable elements which are detrimental to the efficiency of the gas line, because they reduce the space available for the flow and the pressure of the gas in the mains or lines and would be a hazard to the gas consumers. They also showed that it -would require the presence of workmen constantly and regularly to supervise the automatic separators because if they failed to function, the salt water would flow into the pipe line, and that it would cost about $400 per month to properly man this equipment.
 

 We are not impressed by the testimony of one of the plaintiffs and one of their witnesses to the effect that a $228 automatic separator would eliminate the salt water and gasoline and that the remainder thereof could be removed by traps. They admit that they have had little or no experience with a well producing the amount of cubic feet of gas per day, the volume of salt water, and having the pressure that the instant well has.
 

 It appears to us that since the original lease was worth about $500 at the time the defendants secured it, and, as they have already expended $62,500 to get the well, they are just as anxious as the plaintiffs are to market the gas, if possible, in order to realize a return on their investment. Their representatives have studied the problem and up to the present time have been unable to find a solution thereof and we might also point out that the plaintiffs have shown no. effective remedy therefor. They suggest, that their property, together with the well, free of the leases-, should be returned to them, in order that they might try to find some way of profitably operating and developing it. Certainly .this is not a proper answer to the question presented.
 

 The primary term of the leases has. not expired. If the well had proved to be á dry hole, the defendants would have been-able to continue the leases in effect by merely paying the acreage rental charge of' $80 per year. The fact that they succeeded in obtaining a well producing gas, entitles, them, under the express provisions thereof, to continue the leases in effect by paying 6200 per year until such time as the gas shall be utilized or sold off the premises and thereafter to pay the lessors one-eighth royalty on the gas sold. Due to the unusual situation which developed and, as shown by the facts ■ and circumstances of the case, which we have already recited, it is our opinion that the defendants have not-violated the provisions of the leases which-require due diligence in the operation of the-well.
 

 The argument"’ that there was an abandonment of the well is refuted by the fact that the defendants placed a fence around it, tendered the royalty payments of $200 per year, and retained their leases
 
 *114
 
 and secured other leases in the vicinity of the Causey property and are contemplating further study and efforts to solve their problem, in order that they can secure a return on their investment, all of which •negatives any idea of abandonment or forfeiture of the leases and the well. The defendants were spared the aggravating circumstance of having other wells in the vicinity drain the land, because the evidence shows that there were no other wells within several miles of this one and those were on a different stratum.
 

 The complaint of the lessors that the defendants failed to furnish- gas free of cost is predicated on the following clause in the leases: “ * * * Lessors to have gas free of cost from any such well for all stoves and inside lines in the principal dwelling house on said line during the same time by making his own connections with the wells at his own risk and expense.”
 

 It appears that one of the plaintiffs laid a line to the dwelling house and requested the defendants’ representative to provide an outlet from the well to which he might connect his line. The defendants installed pipes connected to the well and placed a nipple thereon so as to reduce the tremendous pressure of the gas to make it serviceable to the lessors for domestic purposes. One of the plaintiffs connected a pipe to the nipple with a reducer, but on account of the difference in the pressure, the nipple froze and the gas did not flow through it.
 

 The testimony of one of the plaintiffs and another witness is that while it is customary to place a gas heater under the pipe near the nipple, in order to prevent freezing, they were unable to.do so because the pipe installed by the defendants was not a sufficient distance from the well to permit the use of a heater.
 

 The representatives of the defendants testified that no complaint was made after the installation of the nipple and no request was made for additional pipe and that they advised the lessors that it would be exceedingly hazardous and dangerous to connect the domestic line with the well without proper regulators because of the tremendous gas pressure from the well. They feared that the gas in great quantities would force its way into the domestic line and cause either an explosion or fire.
 

 One of the plaintiffs who installed the domestic line and who testified, did not share in this apprehension, but it is significant that he did not install the proper equipment to make the well serviceable for domestic purposes, although the defendants were entirely willing for him to utilize all of the gas he needed for domestic purposes. In fact, the amount of this gas would have been nil compared to the volume produced by the well and we find nothing in the evidence tending to show that the defendants tried to deprive the lessors of their right to use the gas.
 

 The plain language of the above clause places the responsibility of making the connection to the well on the lessors at their own expense and risk, and we find that it was their failure to make the proper
 
 *116
 
 connection with the well that made the . gas unavailable to them.
 

 The plaintiff, Mrs. .Goss, takes the position that the defendants breached her lease and forfeited their rights thereunder, because they deposited her pro rata share of the acreage rental money and the royalty payment of $200 per year in the Monroe Bank, instead of the Bank at Ruston, as required by the provisions of her lease. She testified that she wrote the Arkansas Company and asked for remittances, but did not receive any reply. The evidence shows that the money was deposited in the Monroe Bank to her credit.
 

 The defendants filed a plea of estoppel on the ground that Mrs. Goss knew that the defendants were drilling the well, although she had not personally received her pro rata of the acreage rental or the royalty payment. She knew that the defendants had started work and were spending large sums of money to explore and develop the property. She did not notify them that if she did not receive her part of the rent she would cancel the lease. Therefore, she is now estopped to claim that the lease was not in force at the time the well was drilled and completed, as she stood by and permitted the defendants to spend $62,500 to explore and develop the property. Harris et al. v. United Gas Public Service Company et al., 181 La. 983, 160 So. 785; Lieber v. Ouachita Natural Gas & Oil Company, 153 La. 160, 95 So. 538; and Caldwell v. Alton Oil Company, 161 La. 139, 108 So. 314.
 

 As to the payment of the $200 royalty per year for the gas well, the lease does not provide for payment at any particular time nor that the lease will automatically terminate for nonpayment, delay in payment, or error in payment. The testimony shows that the defendants paid and all of the plaintiffs, except Mrs. Goss, accepted and used two of these annual payments of .$200, one for the period of September, 1937, to September, 1938, and the other for the period of September, 1938, to Septémber, 1939. As a matter of fact, defendants paid Mrs. Goss’ part but erroneously de- , posited the money in a bank other than the one designated. There is nothing in the lease which requires the court to forfeit defendants’ right as to her interest, because of this erroneous method of payment — this being merely a failure to perform with literal exactness a personal obligation and not a failure to perform a condition precedent to the continuance of the lease. In that respect, this case is unlike the case of LeRosen v. North Central Texas Oil Company, Inc., 169 La. 973, 126 So. 442, relied on by the plaintiffs.
 

 For the reasons assigned, the judgment of the district court is annulled and set aside, and it is now ordered, adjudged and decreed that plaintiffs’ suit be dismissed at their costs.