152 So.2d 611 (1963)
Hardy N. GREENE, Plaintiff-Appellee,
v.
The CARTER OIL COMPANY et al., Defendants-Appellants.
No. 9907.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1963.
Rehearing Denied April 25, 1963.
Certiorari Refused June 4, 1963.
*612 Blanchard, Goldstein, Walker & O'Ouin. Shreveport, for appellants.
Robinson & Atkins, Homer, for appellee.
Before HARDY, GLADNEY and BOLIN, JJ.
GLADNEY, Judge.
This suit for the cancellation of an oil and gas lease affecting certain land situated in Claiborne Parish, Louisiana, was brought by Hardy N. Greene, as lessor, against The Carter Oil Company, Cheyenne Oil Corporation of Delaware, Milton Crow, Inc., and Oil & Gas Ventures, Inc., lessees, and Placid Oil Company, the purchaser of all oil produced from the leased premises. Plaintiff's demands against Placid Oil Company have been dismissed as against an unnecessary party and that company is not now before this court. The case was submitted to the trial court upon a stipulation of facts and admissions, after which judgment was rendered in behalf of plaintiff and against the named lessees, decreeing a cancellation of the lease and reserving plaintiff's rights, and the rights of his attorney to recover attorney's fees until such time as the judgment of the court becomes definitive. The defendants have appealed.
Pertinent to consideration of the issues presented herein are certain facts undisputed and admitted by the parties as set forth below:
"That Hardy N. Greene, the plaintiff, is the owner of record of the property described as the West ½ of NE ¼ and the NW ¼ of SE ¼ of Section 6, Township 23 North, Range 7 West, of Claiborne Parish, Louisiana, except for certain mineral interest conveyed to other persons.
"That said Section 6, Township 23 North, Range 7 West, contains, according to the official government plat of survey, 369.91 acres.
"That said Section, contains, according to the actual survey made by Danny R. Moore, Registered Civil Engineer, a total of 375.99 acres and that the property owned by the plaintiff affected by this suit and more particularly described above contains 70.24 acres as shown by plat of the Moore survey filed in the record of the case.
"That plaintiff executed an oil and gas lease dated March 23, 1955, filed under Register 204621, Book 213, Page 105e, Caliborne Parish, Conveyance Records, covering said described land of plaintiff. That said Oil and Gas lease was subsequently amended by the parties so as to permit pooling by declaration.
"That by virtue of instruments of record the Cheyenne Oil Corporation of Delaware, Milton Crow, Inc., and Oil and Gas Ventures, Inc., each became the owner of record of an interest in the above described lease, and by virtue of the merger, the interest of The Carter Oil Company came to be owned of record by the Humble Oil and Refinding Company. (These named parties will hereinafter be referred to as defendants.)
"That defendants did exercise and file for record a declaration of pooling dated October 24, 1958, establishing a drilling and production unit composed of the East 160 acres of Section 6, Township 23 North, Range 7 West, and that said drilling unit included the eastern portion of plaintiff's property described above, the amount so included contains 51.57 acres.

*613 "That defendants drilled and completed a producing well on said 160 acre unit and that the well was situated on plaintiff's said 51.57 interest. That said well has at all times since its completion produced in paying quantities and that the entire production of oil from the said well has been regularly sold and delivered to the Placid Oil Company.
"That defendant and others did execute and file a second declaration of unitization on May 15, 1959, and thereby established a drilling and production unit composed of the West 160 acres of the East 320 acres of Section 6, Township 23 North, Range 7 West, Claiborne Parish, Louisiana, and that said second drilling and production unit include the western portion of plaintiff's land and that the portion owned by plaintiff in said second drilling and production unit is 18.67 acres.
"That defendants commenced the drilling of a well on said second drilling and production unit on June 9, 1959, and completed same as a producer of oil in paying quantities. This well was on the 160 acre unit, but was not on the lands of plaintiff. The entire production from said well likewise being delivered and sold to the Placid Oil Company, and at time of trial continued to be so delivered from both wells.
"That in due time Placid Oil Company, the pipe line purchaser, circulated its division order No. 1862 covering the division of interest of the production from the first unit, and reflecting plaintiff's interest as being computed at 51.57 acres.
"That thereafter Placid Oil Company circulated its division order No. 1923 covering the second unit and computing plaintiff's interest at 18.67 acres.
"That the total interest of Plaintiff in the two units, which included all of his property, was computed on the basis that his tract of land contains 70.24 acres.
"That in due course Plaintiff was furnished with a copy of each division order referred to and which he refused to sign and immediately protested to the defendants and to the Placid Oil Company, the Pipe Line Purchaser, contending that his interest in the production from the two units should be computed on a basis of his land containing 82.5 acres as set forth in his lease instrument, regardless of the actual acreage contained in said tract.
"That Placid Oil Company, the purchaser, has refused to account to plaintiff on the basis of 82.5 acres but has offered to account to him on the basis of 70.24 acres.
"That these defendants, being the owners of said lease have refused to direct Placid Oil Company to account to plaintiff on the basis of 82.5 acres.
"That plaintiff refuses to accept an accounting from Placid Oil Company on the basis of 70.24 acres and a formal tender on that basis by Placid Oil Company is waived by plaintiff.
"That plaintiff's right, and the right of plaintiff's attorney to recover attorney's fees is expressly reserved unto him and his attorney until the case is disposed of on its merits."
Also germane to the issues are the following extracts taken from the amended mineral lease, which constitutes the contract between the parties:
"1. In consideration of * * * (2,500.00 Dollars, * * * Lessor hereby leases exclusively to Lessee * * * The West Half of Northwest Quarter of Southeast Quarter (NW ¼ of SE ¼) of Section Six (6), Township Twenty-three (23) North, Range Seven (7) West,
(THIS IS A PAID-UP LEASE. THE PAYMENT *614 OF ANNUAL DELAY RENTALS WILL NOT BE NECESSARY TO MAINTAIN THIS LEASE IN FULL FORCE AND EFFECT DURING THE PRIMARY TERM HEREIN PROVIDED BELOW.) (Parenthesis supplied)
located in Caliborne Parish, Louisiana, which tract of land, for the computation of rentals and royalties based upon acreage, shall be deemed to comprise exactly 82.5 acres whether there actually be more or less. * * *"
"6. The royalties to be paid by Lessee are:
"(a) On Oil * * * produced at the well * * * 1/8 of that produced * * *"

* * * * * *
"(e) If, after completion of a well or wells capable of producing oil or gas, Lessee shall be prevented from producing from the leased land because of lack of market for the gas produced thereof, Lessee shall be allowed six months * * * Thereafter, for any period during which Lessee is prevented from producing mineral by reason of lack of market for the gas product, it shall be considered that production is being obtained in paying quantities, within the meaning of Articles 2 and 11(d), and Lessee shall pay as royalty the sum of Two ($2.00) Dollars per acre per year, due annually upon the anniversary date of this lease; * * * (Emphasis supplied)
"7. The rights of either party hereunder may be assigned in whole or in part * * * If this lease be assigned or sublet * * * delay rentals may be paid by either or both, but the royalties of Article 6 shall be paid only by that Lessee or sublessee in whose strata the well (because of which such royalties shall be due) shall have been completed; provided that if acreage-based royalties under Article 6(e) or 11(d) shall be due from two or more such Lessees or sublessees of different strata, they shall be solidarily obligated to Lessor therefor. * * In the event of release as to all strata under a segregated surface acreage, thereafter the rentals and royalties based on acreage payable by Lessee shall be reduced proportionately." (Emphasis supplied)

* * * * * *
"Section 11.
"(d) If * * * Lessee shall be prevented by Force Majeure from producing from the leased land; or * * * from drilling for oil, gas or other mineral upon the leased land and there is no production therefrom; * * * During any period this lease is continued in force solely under the provisions of this subparagraph, Lessee shall pay as royalty $1.00 per acre per year. * * * During any period in which this lease is maintained under paragraph (e) of Article 6, the acreage-based royalty provided in this paragraph (d) shall not be due to Lessor." (Emphasis supplied)

* * * * * *
"13. For all purposes of this argeement a well situated on any part of a unit created in accordance with the foregoing Article, or upon any part of a unit pooled or unitized by order of any governmental authority and including any portion of the leased land, shall be considered a well located on the leased land. Provided *615 that royalties hereunder (other than acreage-based royalties, provided in paragraph (e) of Article 6 and paragraph (d) of Article 11) shall be computed only upon that portion of production from such unit which is allocated to the leased land under the terms of such order; or (in the absence of allocation under the terms of the order, or in the case of a unit established solely under Article 12) upon the proportion of production from the unit which Lessor's mineral interest therein and subject to this lease bears to the full undivided mineral interest in such unit, the mineral interests to be considered of uniform value per surface area throughout the unit." (Emphasis supplied)
Considerate counsel, after stipulating all essential facts relevant to the proper resolution of the case, have expressed their separate contentions upon which rest their arguments. Plaintiff's counsel contends:
"The contractual obligation contained in the oil and gas lease requires that an accounting be made to Plaintiff, as lessor, for his reserved royalty interest in the oil produced from the premises covered by the lease and from that part of the lease covered by the lease and included within a unit or units on the basis that the land covered by the lease contains 82.5 acres regardless of the actual acreage that may be contained in the property covered in the lease and regardless of the actual production from said property or that part of said property contained within a unit or units."
Defendants' counsel contend:
"1.
That plaintiff, the lessor, has no right or cause of action against the defendants, the lessee, and its assigns, to recover the lessors one-eighth royalty of oil produced from the property covered by the lease and from that part of the land covered by the lease and included within a unit for the reason that lessor's royalty interest has under the express provisions of the lease, been delivered to the pipe line purchaser for the account of the lessor.
"2.
That under the express terms of the lease, plaintiff, as lessor, is entitled to be paid his lessor's royalty only on the basis of the actual production from that part of the land covered by the lease, and the actual production from that part of the land covered by the lease and included within a unit or units.
"3.
That if it should be found that Plaintiff's interpretation of the contractual obligation is correct, still Plaintiff would not be entitled to a cancellation of the lease for the reason that there has existed a bona fide dispute as to the method of computing the lessor's royalty."
It may well be that since the remedy sought by plaintiff is simply for cancellation of the lease, this appeal could be disposed of solely upon the question of whether there is a bona fide dispute between lessor and lessee as to the manner in which the production royalty shall be computed under the terms of the lease. See: Brewer v. Forest Gravel Co., Inc., 172 La. 828, 135 So. 372 (1931); Brown et al. v. Sugar Creek Syndicate, et al., 195 La. 865, 197 So. 583 (1940); Tyson, et al., v. Surf Oil Co., et al., 195 La. 248, 196 So. 336 (1940); Risinger, et al., v. Arkansas-Louisiana Gas Co., et al., 198 La. 101, 3 So.2d 289 (1941); Rudnick et al., v. Union Producing Co., et al., 209 La. 943, 25 So.2d 906 (1946); Touchet v. Humble Oil & Refining Company, D.C., La., 191 F.Supp. 291 (1960).
Upon reflection, however, we have determined that it would be to the best interests of the litigating parties to have a decision *616 upon the issues herein presented, and accordingly, we shall proceed to that order.
We are of the opinion that the trial court did not commit error in overruling the exception of no cause and no right of action as hereinabove pointed out. The dispute actually does involve the manner in which royalty from production shall be computed and, therefore, we find that plaintiff has stated a cause of action.
All issues presented in this suit depend for their proper resolution upon the interpretation to be accorded the words (extracted from Article 1 of the lease): "* * * which tract of land, for the computation of rentals and royalties based upon acreage, shall be deemed to comprise exactly 82.5 acres, whether there actually be more or less." The heart of the dispute is that the lessor claims from the production from the two drilling units royalties based on the 82.5 acres, as estimated, rather than on his actually owned acreage of 70.24 acres. Defendants argue that "royalties based on acreage" has limited application in the lease and applies only to certain royalties paid on a per acre basis.
Harriet S. Daggett in Mineral Rights in Louisiana, (1939 Ed., p. 173) sets forth the following concept of royalty:
"The word royalty originated in England where it was used to designate the share in production reserved by the crown from those to whom the right to work mines and quarries was granted. Such is its proper use today in mineral contracts. It is the price paid for the privilege of exercising the right to explore. If that right is granted by a lease contract, it is the whole or part of the consideration for the lease. If that right is granted or reserved by a sale, it is the consideration in part or whole of the sale. Royalty in itself cannot be used to designate the fundamental right which is being dealt with but only to indicate the percentage, the price, the rent, the consideration attached to or proceeding out of the right or that may proceed from it during its existence. The royalty depends upon the continued existence of the right to which it is an appendage. It cannot have a life of its own any more than could interest exist apart from the note or debt to which it is attached. * * *"
Royalty is defined in 58 C.J.S. Mines and Minerals § 213, p. 537, to be: "* * * a share of the product or profit reserved by the owner for permitting another to use the property * * * the compensation provided for the privilege of drilling for oil and gas, consisting of a share in the oil and gas produced under existing leases * * *." See also Vincent, et al. v. Bullock, et al., 192 La. 1, 187 So. 35, 39 (1939).
The meaning and implications of the term "royalty" are affected and to a large extent controlled by its use in the contract between the parties. Such contracts as oil and gas leases have the effect of law upon those who form them, and none except the parties can abrogate or modify them. LSA-C.C. Art. 1945. Apposite here are certain principles of interpretation provided by the Civil Code, succinctly stated in Vincent, et al. v. Bullock, et al., supra, page 39, 187 So. page 39:
"That courts are bound to give legal effect to all such contracts according to the true intent of all the parties * *, `and this * * * intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences.' Article 1945. `The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use.' Article 1946. `When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms.' Article *617 1950. And `When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other furnishes a rule for its interpretation.'"
It was observed in Coyle, et al. v. North American Oil Consolidated, et al., 201 La. 99, 9 So.2d 473, 478, (1942) that:
"The rule is well established that mineral leases must be construed as leases, and that the codal provisions applicable to ordinary leases must be applied."
The words "bonus", "rental" and "royalty" which frequently appear in and are used in connection with oil and gas leases are to be understood in the ordinary and popular sense. In common usage "bonus" has been held to mean the consideration paid or agreed to be paid for the execution of the lease; "rental" to mean the consideration for the privilege of delaying drilling operations; and "royalty" a share of the production or the proceeds therefrom reserved to the owner for permitting another to use the property. Words & Phrases, Per. Ed., Vol. 5, p. 672; Vol. 37A, p. 600. The above reference appears in Texas Co. v. Fontenot, 200 La. 753, 8 So.2d 689 (1942).
The lease involved in this controversy provides as to royalties based on acreage that the lessor or land owner shall be paid at a fixed amount of one or two dollars per acre, as the case might be, where under certain conditions production is shut in, or he shall receive his share of, or the value thereof, of the production. Royalty payable on a per acre basis is sometimes referred to simply as acreage based royalty, whereas royalty payable from production is called production royalty. Royalty payments based only on the number of acres, or accounted for by a fixed sum, is in the nature of a payment in lieu of production as it accrues by reason of the fact that the well is not on production, or shut in. As indicated in Article 6 of the lease, provision is made for the lessor's share of royalty from production, 6(a); and for royalties payable on a per acre basis in Articles 6(e), 7, and 11(d). These payments are referred to as acreage based royalties in Articles 7 and 13.
By virtue of the language employed in the lease, it is clear to us that royalty based upon acreage and acreage based royalty are synonymous and mean one and the same thing. As heretofore noted, payment of these royalties is based solely on the number of acres assigned to the leased premises, whereas the payment of production royalties is influenced by many other factors, especially those affecting the volume of production. Where production is from a well situated on a drilling unit created through declaration or contract, as in the instant case, or by order of the regulatory authority, royalties paid from production must conform to a standard rule of computation that will insure equitable and fair accounting to the several interests involved. The use of estimated acreage as a factor in determining production royalties could thus create undesirable and unfair results.
A question arises as to whether under the shut in gas provisions of Article 6(e) or Force Majuere clause of Article 11(d), payments made to the land owner are actually royalty payments, or whether in fact, they are rental payments. Risinger v. Arkansas-Louisiana Gas Co., et al., 198 La. 101, 3 So.2d 289 (1941), regarded such payments as royalty. It is pointed out by Leslie Moses in "Problems in Connection with Shut-In Royalty Provisions in Oil and Gas Leases", 23 T.L.R. 374, 377, that the fact that the clause labels the payment royalty does not necessarily make it a royalty payment, but it is indicative of the intent of the parties to the lease to consider such payments royalty.
Where, as in this instance, the acreage of the leased premises is estimated, the purpose is to foreclose uncertainty as to *618 bonus, or rentals, or royalty payments based on acreage when a producing well is shut in. A stipulation for estimated acreage is not forbidden by law and, therefore, parties to a contract may bind themselves with respect thereto, and this is true whether or not the estimated acreage exceeds that actually owned.
The primary question under consideration, however, is whether royalties based upon estimated acreage as used in Article 1 of the lease are inclusive of royalties from production. Our answer must be in the negative. "Acreage based royalty" of "royalty based on acreage" as used in the lease has a distinct and special status and application, and refers to per acre payments as provided. The royalties payable from production may not be computed in such a manner.
If, arguendo, we should hold that payment of production royalty from a unit should be computed upon estimated acreage, then plaintiff would receive royalty in excess of his actual interest in the drilling unit. As previously pointed out such an agreement as between the parties bound by the contract is lawful, but of necessity such a payment could not be allowed to infringe upon the rightful shares of other royalty owners of the mineral production. Such a complication furnishes a further reason why royalties based upon acreage have a significant meaning and require different means of satisfaction. After reading Article 13 of the lease, we hold that computation of the royalty payments to plaintiff from production must conform to the manner therein provided, viz.:
"* * * Upon the proportion of production from the unit which Lessor's mineral interest therein and subject to this lease bears to the full undivided mineral interest in such unit, the mineral interests to be considered of uniform value per surface acre throughout the unit."
Lessor's mineral interest in the production from the wells on the two separate 160 acre units must be in the proportion of plaintiff's actual acreage in the unit to the full undivided mineral interest in the unit, or in the ratio of 51.57 to 160 and 18.67 to 160, respectively.
In concluding that production royalties from established drilling units should be based upon actual acreage, we are in disagreement with the judgment which has been appealed to this court, and, therefore, it will be reversed.
It is ordered, adjudged and decreed that the judgment from which appealed be annulled, set aside and reversed, and it is now ordered that there be judgment in favor of the defendants, Humble Oil and Refining Company, Cheyenne Oil Corporation of Delaware, Milton Crow, Inc., and Oil and Gas Ventures, Inc., and against Hardy N. Greene, plaintiff, rejecting plaintiff's demands; that there be recognition of the validity of that certain oil and gas lease dated March 23, 1955, filed under Register 204, 621, Book 213, page 105, Claiborne Parish Conveyance Records, covering:
"The West Half of Northeast Quarter (W½ of NE¼), and Northwest Quarter of Southeast Quarter (NW¼) of SE¼) of Section Six (6), Township Twenty-Three (23) North, Range Seven (7) West, located in Claiborne Parish, Louisiana,"
and that the above described tract of land shall be considered as containing 70.24 acres, as shown by actual survey of Danny Moore, for the purpose of computing plaintiff's production royalty from the drilling units formed in pursuance to declarations of pooling:
(1) dated October 15, 1958, establishing a drilling and production unit composed of the East 160 acres of Section 6, Township 23 North, Range 7 West, including 51.7 acres of plaintiff's property described above; and
(2) dated May 15, 1959, establishing a drilling and production unit composed of *619 the West 160 acres of the East 320 acres of Section 6, Township 23 North, Range 7 West, including 18.7 acres of plaintiff's property described.
Plaintiff-appellee is cast for all costs.
BOLIN, J., concurs in part and dissents in part, giving written reasons.
BOLIN, Judge (concurring in part and dissenting in part).
I think this Court's refusal to cancel the oil and gas lease in question based on a finding that a bona fide dispute existed as to the amount of royalties due plaintiff is sound. See Rudnick et al. v. Union Producing Co., et al., 209 La. 943, 25 So.2d 906 (1946) and Bailey et al. v. Meadows et al. (La.App., 2 Cir., 1961) 130 So.2d 501 (writs refused) and authorities cited in both cases.
As the only issue tendered is plaintiff's right to cancellation, I seriously doubt our wisdom in going further and making any judicial pronouncements as to the meaning of the disputed acreage provision of the lease. While our zeal in going beyond our required duties is to be commended if it results in a real service to the litigants, such effort might well be characterized as our voluntary assumption of the risk of making two mistakes when we should have limited ourselves to the possibility of making only one.
I have serious doubts as to the true intent of the parties as related to the disputed provision of the lease. It is because of such doubts that I think defendants were justified in withholding royalty payments. In any event, if plaintiff sees fit subsequently to initiate different proceedings in order to determine what rights flow to him under such provision, I think he should be allowed to do so without being prejudiced by our enunciations in the instant case. The issues might be presented in an entirely different light if the relief sought had not been the harsh remedy of cancellation.
I, therefore, respectfully dissent from that portion of our opinion enunciating any views beyond rejecting plaintiff's demand for a cancellation of the oil and gas lease because of a bona fide dispute as to the amount of royalties due.
Rehearing denied; BOLIN, J., dissents.