499 So.2d 988 (1986)
James D. MORRISON, Plaintiff-Appellant,
v.
D & L PARTNERSHIP, et al., Defendants-Appellees.
No. 85-843.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1986.
*989 Gaharan & Wilson, Donald R. Wilson, Jena, for plaintiff-appellant.
J.P. Mauffray, Jr., Patrick L. Durusau, Jena, for defendants-appellees.
Before LABORDE and KING, JJ., and PAVY[*], J. Pro Tem.
H. GARLAND PAVY, Judge Pro Tem.
Plaintiff appeals from a judgment which denied his claims for reformation of a mineral lease and its cancellation for failure to reasonably develop.
Plaintiff owned six residential lots in the Tullos community of LaSalle Parish. On July 13, 1981, he executed a mineral lease on three of the lots in favor of Shirley McLean Smith, wife of F.W. Smith. The printing of this lease provided a primary term of ten years. The words "ten years" were marked out and replaced by the words "six months." There is also in the record an unsigned lease by plaintiff dated the ________ day of August, 1981, to Floyd Smith, husband of Shirley McLean. This lease applied to the three residential lots not covered by the lease of July 13, 1981. It contained the same primary-term changes as the lease first described. On August 20, 1981, Mr. and Mrs. Smith, the lessees in the lease of July 13, signed a quit claim and release of the lease dated July 13, 1981. On the same day, plaintiff and his wife executed another mineral lease to Shirley McLean Smith, wife of F.W. Smith. This lease was on the same type form and is the lease in question. It applied to all six of the residential lots. The printed provision calling for a ten-year primary term was not changed. By typing "NA" in the blank for the delay-rental amount, the "drill or pay" clauses in all three leases were rendered ineffective.[1] It was admitted that no consideration was paid at the signing of the lease in question.
On August 25, 1981, lessee transferred a portion of her interest in the lease to D & L *990 Partnership composed of Huey P. Long and Ray Dudley. In late 1981, a producing well was brought in on one of the lots.
In the area, production was generally from very shallow reservoirs at about 2,000 feet. These were known as the upper or top Wilcox sand. Spacing regulations permitted one well per residential lot. Testimony indicates the wells could not pull oil from more than 50 feet. It appears that, because of this shallow production, leases in the area are usually granted for primary terms of one year or less.
On July 27, 1982, plaintiff's attorney addressed a letter to Mrs. Shirley McLean Smith and D & L Partnership demanding a reformation of the lease of August 20, 1981, so as to provide a six-month primary term and also demanding further development of the leased premises. In October, 1982, plaintiff sued the original lessee and the partnership for reformation and for cancellation based on failure to produce in paying quantities and failure to reasonably develop. The plaintiff's brief is confined to the question of reformation and cancellation based only on failure to reasonably develop.
A trial was held in March, 1985. At the conclusion of the taking of evidence, the trial judge held there was no evidence of fraud and denied reformation. Later, in a written opinion, he denied relief based on failure to develop because the demand for it was in the "... early stages of the primary term."
It is common knowledge that ten-year oil, gas and mineral leases in these times are unusual. The evidence shows that leases in this area were generally for a short primary term.
At the trial, plaintiff testified that he had no intention of signing a lease with a primary term of ten years and thought it had a primary term of six months. It was signed at his shop; he stated that he was under the impression that his lawyer had approved it. No one took the stand to contradict his testimony.
Accordingly, we are inclined to the conclusion that plaintiff has shown error, at least, in the confection of the lease and that there should be reformation. However, we are prohibited from doing so by the public records doctrine and the provisions of Louisiana Revised Statutes 9:2721. The latter provides as follows:
"No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties."
There are many cases dealing with the right of a third party to rely on the public records. The pioneer case is McDuffie v. Walker, 125 La. 152, 51 So. 100 (1910). A case showing the strength and coverage of the rule is City Bank & Trust Co. v. Caneco Construction, Inc., 341 So.2d 1331 (La.App. 3d Cir.), writ denied, 345 So.2d 52 (La.1977). In that case, plaintiff executed a cash sale which was duly recorded. Thereafter, the vendee gave a mortgage. In a contest between the mortgagee and the plaintiff-vendor, the latter tried to assert a vendor's lien because the check given for the cash price was worthless. The court held that the public records doctrine prevented the vendor from asserting any claim prejudicial to the rights of the mortgagee who had relied on the public records.
There is no fraud by either of the defendants or collusion between them. Therefore, we merely hold that under the facts of this case, a third party taking rights on the faith of the public record is protected and cannot be held to provisions which might be contained in a document after it is reformed for simple error.
It being the rule of the case that the lease must be held to have a ten-year primary term, we are now presented with the *991 question whether, under the peculiar facts of this case, a lessee is under an obligation to reasonably develop the premises upon production but during the primary term.
The obligation to reasonably develop the leased premises has been long recognized in Louisiana. It is now part of the lessee's obligation "... to develop and operate the property leased as a reasonably prudent operator." See Louisiana Mineral Code Section 122 and comments thereunder.
The briefs present three Louisiana cases in which reasonable development was sought during the primary term. These are Caddo Oil & Mining Company v. Producer's Oil Company, 134 La. 701, 64 So. 684 (1914); Stubbs v. Imperial Oil & Gas Products, 164 La. 689, 114 So. 595 (1927); Risinger v. Arkansas-Louisiana Gas Company, 198 La. 101, 3 So.2d 289 (1941).
Stubbs and Caddo Oil both involved contracts with no initial consideration to the lessor. Lessees obligated themselves to drill wells within a certain time. There was a provision that, upon production, the lease would continue for ten or twenty years and as long thereafter as there was production. Both suits were instituted after production and within the designated terms. In one case, the court cancelled the lease for failure to develop. In the other, the evidence did not warrant cancellation. There was no express discussion of the question whether there could be cancellation within the primary term for failure to develop. Perhaps, it was a foregone conclusion that an obligation to develop existed because of the peculiar provisions of the leases in those cases.
In Risinger, the suit to cancel for failure to reasonably develop was within the primary term. The lessee had brought in a well but could not then market it and started paying rentals in lieu of marketing. These were not ordinary delay rentals; they were a type of shut-in payment. The court stated:
"The fact that they succeeded in obtaining a well-producing gas, entitles them under the express provision thereof to continue the lease in effect by paying $200 per year until such time as the gas shall be utilized or sold off the premises and thereafter to pay the lessor's one-eighth royalty on the gas sold. Due to the unusual situation which developed and, as shown by the facts and circumstances of the case, which we have already recited, it is our opinion that defendants have not violated the provisions of the lease which require due diligence in the operation of the well."
At 58 CJS, Mines and Minerals, Section 202, Page 470, it is stated that "... the lessee is under an implied obligation to proceed in good faith and with reasonable diligence to develop the land; and especially does such obligation arise where oil or gas in paying quantities has been discovered."
Perhaps, that language implies that production triggers the obligation to reasonably develop. There are several cases cited in support of the statement. We have examined many of these. They do not form a strong and consistent line of authority. Some of these cases deal with suits brought after the primary term. Others turn on the peculiar language in the leases.
In the comments to Article 122 of the Louisiana Mineral Code, there is language from which one could infer that production triggers the obligation to reasonably develop. However, there are no actual holdings.
We approach this case upon its peculiar facts. There was no initial consideration. A ten-year primary term is designated. There is no obligation to drill or pay rentals from year to year. In fact, until lessee expended effort and money to drill a well, there was probably no contract or at least a voidable one.
To allow the lessee to escape the requirement of development for 10 years would be contrary to public policy. It would take the property out of commerce and put a premium on inaction.
Such a course would thwart the purpose of mineral leasing. It is to drill, to produce and to market. The contrast between this tract of land and the other tracts in the *992 field illustrates the necessity of requiring reasonable development now.
To allow lessee to avoid developing for so long a time would be unfair to lessor. He has given up his rights with the expectation of receiving a return within a reasonable time. Without such a requirement, the lessor is left to the whim of the lessee, to his economic situation and to speculation for ends of his own.
We do not at this time decide whether reasonable development can be successfully demanded during the primary term of a lease which provides for yearly delay rentals in lieu of drilling. This ruling is restricted to the particular facts of the case.
We now turn to the question of whether the lease has been reasonably developed and whether cancellation is warranted.
In some situations or for some purposes the maintenance of production may be considered separately from the obligation to reasonably develop. However, in this case because of its peculiarities we treat the requirement of production as part of the obligation to reasonably develop.
This lease was given in August, 1981. A well to a depth of 1,900 feet was completed that fall or winter. The well produced irregularly until about March of 1984. Its total production amounted to approximately $30,000. No other wells have been drilled by lessee nor were any contemplated at the time of trial.
Plaintiff tendered a geologist, Jack B. Warren. He had been involved in the Tullos-Urania Field for approximately seven years and had available logs from ten wells in the field. Some of these wells were on adjoining property and all within 200 yards from the leased property. He thought drilling on the leased premises would yield a five to eight-foot hydrocarbon sand which would produce three to six barrels per day. He stated that the actual production would vary according to how the well was completed and pumped. The chances of striking a commercial producer on the leased premises was 75 percent, and he thought that the property offered as good a drillable prospect as one could find. Most drilling in the field was on a lot-to-lot basis to pull as much oil as possible. He stated that a well on the leased premises had been drilled and abandoned in 1979. The cost of drilling a salt-water disposal system would run about $30,000.
Plaintiff also tendered Mr. Russell Flowers who had been in the oil business all of his adult life. He had been a producer for seven years. He frankly admitted he was interested in the leased property but denied it would affect his testimony. He had interests in 21 Wilcox wells. There were five wells offsetting this property. He had completed 85 wells in the Tullos Field. Eighty-five percent of the wells in the Tullos Field are commercial producers. He had operated defendant's well for a time. The lessees had used his salt-water disposal system. It was discontinued after they became three months in arrears. He had gone up on the price because of increased electrical costs. He would put one well per lot on this lease and at least one every six months. Other operators in the field are drilling one well to each lot in town and two wells per acre out of town. In three years, he would have drilled at least four wells. A 3½-barrel-per-day well is profitable. He advised making a salt-water disposal system out of the abandoned hole on the leased premises. There was another salt-water disposal system in the area which the lessees had once used. It belonged to a man named Douglas Murphy. It would cost approximately $20,000 to make a salt-water disposal system out of an abandoned hole. Without an abandoned hole it would cost from $60,000 to $65,000. To drill a well to the Wilcox sand would cost approximately $13,500. To make it a producing well would cost approximately $40,000.
The defendant partnership did not have an expert witness. Both partners testified. According to Long, they had used both the Flowers and the Murphy salt-water disposal systems. He claimed that although the well was not producing for most of 1984, he had it reworked and in January, 1985, it was ready for production but they could *993 not dispose of the salt water. He did not think it would be economically feasible to drill a salt-water disposal system; that the Murphy salt-water disposal system had trouble and they could not use it at a time past. He has wanted to sell the lease for quite a while. If they had more investors they could afford to drill a salt-water disposal system, but it would not be economically feasible to do so for one well. He said that drilling depends on "economics and times," and that if he had a six month lease it would be drilled during that time and if a ten-year lease "... you drill what is necessary and you drill it at a later time when you've got a better deal." The partnership had no definite program for drilling but did intend to drill more wells. Because they were having trouble with the one well, they were not drilling any other wells.
According to Dudley, he took over the management of the lease in mid-1983. Flowers had worked the well as operator for seven or eight months. They did not pay Flowers' bill for use of his salt-water system and he shut them off. At one time, they had negotiated with Flowers to sell him the lease. Total production from the well had yielded close to $30,000 and they had put more than those receipts back into the well. He admitted they were doing nothing with regard to the well except maintaining it with the hope of getting more production. They were looking at other properties for salt-water disposal and had never tried to get back onto the Flowers or Murphy salt-water disposal systems. To drill another well, they would need other partners. It was doubtful (a 50/50 chance) if they would drill even with a salt-water disposal system available.
The partnership members have been residents of Houston, Texas. They have had local operators but their contact with the actual working of the well has been limited. There is no overall program for development of the whole leased premises. They are awaiting a purchaser or other investors.
Once when the well stopped producing, the partnership employed one Shaeffer to make it produce. After a while, he moved away. No further efforts were made to put the well on production at that time. There was an admission that the partnership would only drill what was necessary to keep the lease alive. They have not tried to get back on the Flowers or Murphy salt-water disposal systems. There are a number of wells in the immediate vicinity. Most of them have access to salt-water disposal systems. Defendants have made no effort to use one of these systems. It would cost only $13,500 to drill a well to the point of knowing definitely whether it would be a possible producer or a dry hole.
In the leading case of Carter v. Arkansas-Louisiana Gas Company, 213 La. 1028, 36 So.2d 26 (La.1948). the Supreme Court stated that whether in any given case the lessee has sufficiently developed the lease property is a question of fact which must be resolved by a consideration of the facts and circumstances of the particular case.
The court further quoted from a leading federal case these words: "... whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interest of both lessor and lessee, is what is required...."
In this case, the interest of the lessor has been satisfied. The lease ought to be cancelled.
The lease contained a provision that in case of cancellation or termination, lessee would have the right to retain certain acreage around each well "... producing, being worked on or drilling hereunder...." The evidence does not show that there was either production, workover or drilling at date of trial. We do not believe lessee should be allowed a further opportunity to save the one well after trial. Whether and to what extent he may be allowed such an opportunity before trial but after suit has been filed is not posed in this case.
The mineral code provides for partial dissolution of the leased premises. See Article 142 of the Louisiana Mineral Code. This is in the court's sound discretion. The *994 one well herein produced irregularly and was not active at the time of trial. The defendants had over two years from suit to trial in which to put the well in production. There is nothing in this case that warrants a partial cancellation.
Accordingly, it is ordered that the judgment of the lower court is reversed and there is now judgment in favor of plaintiff, James D. Morrison, and against Shirley McLean Smith, D & L Partnership, Ray Dudley and Huey P. Long, decreeing that the lease from plaintiff to Shirley McLean Smith dated August 20, 1981, to be of no further force and effect and ordering the cancellation thereof insofar as it bears upon the following-described property in LaSalle Parish, Louisiana, to wit:
Lots 2, 3 and 4 of Block 6 of the Russell Addition to the Town of Tullos. LaSalle Parish, Louisiana.
Lots 1, 2 and 3 of the James Morrison Subdivision of the Southeast Quarter of the Southeast Quarter of Section 26, Township 10 North, Range 1 East, LaSalle Parish, Louisiana.
All costs of this suit are to be borne by defendants.
REVERSED AND RENDERED.
NOTES
[*] Judge H. Garland Pavy of the Twenty-seventh Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] All three of these leases were on Bath's Form La.Spec. 14-BRI-2A-PX 10-65.