126 So.2d 819 (1961)
Michel P. LELONG, Plaintiff-Appellee,
v.
D. L. RICHARDSON et al., Defendants-Appellants.
No. 9384.
Court of Appeal of Louisiana, Second Circuit.
February 2, 1961.
*820 Goode, Shea & Dietz, Estess & Coyle, William Greene, Wilson, Abramson, Maroun & Kaplan, Shreveport, for appellants.
Bethard & Bethard, Coushatta, for appellee.
Before HARDY, GLADNEY and BOLIN, JJ.
HARDY, Judge.
This suit was instituted by plaintiff as owner and lessor of the property involved, seeking the cancellation of an oil and gas lease allegedly claimed to be held by the *821 named defendants in their capacities as original lessees or by sub-lease or assignment of the interests set forth. Coupled with the prayer for cancellation of the lease plaintiff further claimed damages to his land and growing crops caused by defendant's operations, together with the sum of $5,000 as attorney's fees. After trial there was judgment in favor of plaintiff ordering cancellation of the lease as prayed, with the exception of forty acres around a gas well located on the described property; dismissing plaintiff's claim for damages to his land and crops, but awarding the sum of $2,500 as attorney's fees. The judgment reserved plaintiff's right to sue for damages suffered as the result of his inability to contract a mineral lease on the land due to defendant's failure to cancel same, and for any damages suffered because of drainage of mineral products due to the drilling and production of wells adjoining the property described. From this judgment defendants have appealed. Plaintiff has answered the appeal, seeking the amendment of the judgment by the cancellation of the lease on the whole of the property, awarding damages for the loss of the use of plaintiff's land taken by slush pits, in the amount of $520, and increasing the award of attorney's fees to $5,000.
Chronologically the facts established, without substantial dispute, are as follows:
Plaintiff, Michel P. Lelong, as owner of Section 25, Township 12 North, Range 11 West and Section 30, Township 12 North, Range 10 West, embracing approximately 1,250 acres located in Red River and De Soto Parishes, executed an oil, gas and mineral lease of date July 8, 1957, in favor of the defendant, D. L. Richardson. Material provisions of the lease which are involved in the determination of the issues tendered by this appeal read as follows:
"2. Subject to the other provisions herein contained this lease shall be for a term to October 15, 1957 (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

* * * * * *
"3. The royalties to be paid by lessee are:

* * * * * *
"(c) Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50.00 per well, per year, payable quarterly, and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract."
Before expiration of the "primary term" lessees began drilling operations, and, on or about November 27, 1957, completed a well located in the Southwest Quarter of Section 25, which well designated as Lelong-Richardson No. 1, was capable of producing gas in commercial quantities, but there was no available market for same, and, accordingly, it was shut in. On December 6, 1957, plaintiff-lessor executed an act ratifying the original lease of date July 8, 1957, declaring said lease to be "a valid subsisting oil, gas and mineral lease." This ratification was executed after the expiration of the primary term of the original lease and after completion of well No. 1. A check dated January 17, 1958, in the sum of $50, representing the shut-in royalty payment under Article 3(c) of the lease agreement, was transmitted to and received by plaintiff-lessor. By letter dated May 6, 1958, plaintiff made formal demand upon lessees for commencement of additional drilling within sixty days or cancellation of the lease under the provisions of LSA-R.S. 30:102. In compliance with this demand lessees began operations for the drilling of an additional well at some time during the month of June, 1958. Due to a blowout and resulting difficulties lessees did not complete this well, designated as Lelong-Richardson No. 2, located in the extreme Northwest Quarter of Section 25 at a depth of approximately 1,028 feet until on *822 or about September, 1958. There was no further development of the leased property and no market for the gas from either well. Checks for shut-in royalties on wells No. 1 and No. 2 in the amounts of $50 each, dated January 2, 1959, were transmitted to, received and retained by plaintiff.
In our opinion the record fully justifies the conclusion that lessees, from and since the completion of Well No. 1 in November, 1957, in good faith exerted every reasonable and diligent effort in attempting to procure a market for the gas.
On April 29, 1959, plaintiff again addressed a letter to some, though not all, of the owners of interests in the subject lease, notifying them that he considered the lease to be null, void and of no further force or effect for failure to comply with its terms and conditions; demanding an instrument of cancellation and rescission of the said lease within ten days as provided by LSA-R.S. 30:102, failing which he advised that suit would be instituted for the purpose of effecting a cancellation and demanding damages and attorney's fees. Enclosed in this communication plaintiff returned the checks representing shut-in royalties, after having held same, though uncashed, since receipt thereof.
In or about the month of March or April, 1959, the Louisiana Intrastate Gas Corporation, commonly known as "Cleco", evidenced an interest in purchasing gas from the area in which the leased property was located. It is established that this interest on the part of Cleco was due to the development of other wells in the vicinity, together with an improvement in the market for gas. After protracted negotiations Cleco actually began purchasing gas from Well No. 1 on or about November 1, 1959, although the formal gas purchase agreement between Cleco as buyer and lessees as sellers was not executed until December 14, 1959. Meanwhile, plaintiff had filed this suit for cancellation on June 1, 1959.
The record preponderantly establishes the fact that defendants, since obtaining a market for gas, have unsuccessfully attempted to persuade plaintiff to withdraw this suit, and, further, it adequately establishes the fact that they are ready, willing and able to prosecute operations for the development of the leased property in accordance with reliable geological information and approved business practices of the industry.
Plaintiff contends he is entitled to cancellation of the lease; first, on the ground of failure of consideration constituting error of law and fact. The principal support for this contention is found in the admission in evidence of two letters directed to plaintiff and signed by D. L. Richardson, the original lessee dated respectively June 26 and July 8, 1957. Plaintiff urges that it was his understanding, on the basis of the letters to which reference is made, that the lessee would undertake the drilling of four shallow wells and one deep well (6,500 to 7,000 feet), and that these promises constituted the true consideration for the execution of the lease. In support of this position counsel for plaintiff argues that the letters have the effect of counter letters and should be considered as evidence of the true and moving consideration for the execution of the lease. Without necessity for delving into authorities on this point, it suffices to say that we find nothing in the letters which would justify the conclusion of a commitment on the part of Richardson as the original lessee. In support of this finding we recite the full text of the respective letters of June 26th and July 8th, as follows:
"Referring to my visit with you yesterday, I am enclosing an oil and gas lease in triplicate, the primary term being to October 15, 1957.
"Mr. Lelong, as I stated before, the surface of your land will be treated as if it were my own land, we will drill near a road or by the Bayou Pierre, so as not to damage any of your growing *823 crops or cleared land, should some damage be made, then we will pay you such damages as is mutually agreed on, and will level all damaged area to its original condition.
"I hope you will sign the enclosed lease in duplicate, keeping the third one for your files, and send it to me as soon as possible, I will then make my plans for the drilling of shallow wells and the first deep one at the same time; it is possible that the State Oil Commission will only allow one deep well, 6500 feet or deeper to a tract of 640 acres, the shallow wells, of course, can be drilled on all most any size tract.
"I have not recorded the last lease you signed on section 25, and I will return it to you when I receive the enclosed signed lease. I will be ready to start the plans for drilling as soon as I reveive (sic) the lease, and of course I hope to find production at around 6500 to 7000 feet beside the shallow production, which I am sure is there, by the drilling of 4 shallow wells we will find it."
"In answer to your letter of the 3rd, I am enclosing an oil & Gas lease in triplicate, for 1280 acres, being sections, 25 and 30, in Red River and De Soto Parishes. Have made the expiration date to same as in the leases you returned, being October 15, 1957.
"I will be able to complete my program with the above acreage, and will do my best, with the best drilling skill possible, to get production on the above lands
"You may keep one of the copies for your file and send me two signed."
Additionally, it is appropriate to note that the letters preceded the execution of the lease, which must be considered as the complete exemplification of the agreement between the parties reduced to writing, executed as an authentic act and duly recorded. Further appropriate to this point is the convincing evidence of the record that defendants proceeded with development of the leased premises within the primary term fixed, and plaintiff advanced no objection relating to failure of consideration. Plaintiff's formal demand for cancellation of the lease is based upon "* * * failure to comply with its terms and conditions, * * *."
The failure of compliance upon which plaintiff predicates his demand for cancellation, in the final analysis, rests upon the alleged failure of lessees to adequately develop the leased property under the provisions of the lease agreement, citing Wier v. Grubb, 228 La. 254, 82 So.2d 1. The cited case is not appropos under the facts. It involved the development of 335.19 acres on which three producing oil wells and one dry hole had been drilled. One of the producing wells failed and was subsequently abandoned. The distinction between the handling of wells producing oil and those producing gas is so obvious as to scarcely deserve comment. Oil is a mineral readily marketable, and, pending pipeline transportation, may be stored in tanks, whereas in those instances in which there is not an available market for gas there is no practicable method of storage. This distinction was recognized and concisely stated in an article by Honorable Leslie Moses in XXIII Tulane Law Review, 376, as follows:
"Oil can be removed from the ground and stored in tanks, moved in trucks or pipelines or tank cars. On the contrary, the only important storage place for natural gas is one of the natural underground reservoirs in which it is found."
Remuneration attendant upon the discovery of gas is completely dependent, first, upon a market, and, second, upon transportation thereof. Additional factors which influence both the buyer and seller of gas involve the determination of potential *824 reserves and the distance to a pipeline transportation facility. These elements are mentioned because in our opinion they have a definite bearing upon the equities of the instant case.
There is no question as to the fact that at the time of completion of the Lelong-Richardson No. 1 as a commercially productive gas well there was no available market for the commodity. Following the completion of other wells by other operators in the same area, a market was developed.
Expert testimony from a geological standpoint was developed by one witness on behalf of plaintiff and one on behalf of defendants. It was the opinion of plaintiff's witness that the subject property could be profitably developed by additional drilling upon a recommended spacing basis of 160 acres, but admittedly this witness recognized not only the fact that the possibility of successful development was limited to certain areas, but further that the lenticular formation of the sands involved added to the "gamble" which must be made by lessees. Defendants' expert witness was substantially in agreement as to the possibility of profitable development but his estimate of reserves on the basis of available geological information was substantially below that of plaintiff's geologist. Under the circumstances we are not inclined to attach great weight to this expert testimony, first, because it is largely speculative and deals with possibilities, and, second, because such testimony was developed on the occasion of the trial which was held several months after the market for the gas had been procured.
The controlling issue with which we are confronted resolves itself into the necessity for determination as to whether the payment of a shut-in royalty on a commercially productive gas well in the absence of a market for said gas constitutes a payment of royalty justifying the continued effect of the lease beyond its primary term under the habendum clause. Defendants rest upon an affirmative answer to this proposition.
The contrary position upon which plaintiff depends requires determination as to whether failure to develop extensive acreage by continued drilling operations justifies cancellation of the lease.
The opposed equitable rights of the parties litigant are not substantially preponderant in favor of one or the other. Briefly stated, the lessor has the right to expect and require the diligent development of the leased premises in order that he may receive a maximum monetary return upon whatever minerals may be produced from his land. On the other hand, the lessee has the right to a reasonable consideration in connection with his development which would preclude the necessity for substantial expenditures relating to the development of the potential production of a mineral which can not be sold.
There is posed the question in the instant case as to whether these respective rights of lessor and lessees can be co-extensively recognized and effected. There is one inferential conclusion which can be established, namely, that both lessor and lessee, unless there is a showing to the contrary, are equally anxious to realize a profit.
We have found the issue tendered by this cause exceedingly difficult of determination. Unfortunately, there is a scarcity of jurisprudence in our own State and we find no case in which an absolute principle has been enunciated. Admittedly the pronouncement of such a principle may be impracticable. Our Supreme Court has definitely declared that the definition of adequate development is a question of fact dependent upon a consideration of the facts and circumstances established in a particular case, Carter v. Arkansas Louisiana Gas Company, 213 La. 1028, 36 So.2d 26, quoted in Sohio Petroleum Company v. Miller, 237 La. 1015, 112 So.2d 695.
The opinion of Mr. Chief Justice Fournet touched on the issue in Sohio Petroleum Company v. V. S. & P. R. R. et al., 222 La. 383, 62 So.2d 615, 620, and held that the *825 payment of a shut-in royalty was optional with the lessee. The exact pronouncement in the opinion was as follows:
"Article 3 of the lease, relied on by the plaintiffs as an alternative ground for the cancellation of their leases, does not provide for a forfeiture of the lease in the event of the failure of the lessee to pay the shut-in well fee or royalty of $50.00 a year. The payment of this royalty is not made a condition precedent for the continuation of the lease. Instead, the provision makes it optional with the lessee to make such payment if he wants it `to be considered that gas is being produced within the meaning of Article 2' of the contract, i. e., the primary term is to be continued so long as minerals are produced." (Emphasis supplied.)
In the case before us the shut-in royalty was paid with the intention on the part of lessees to continue the lease in effect through the extension of the primary term. The above quotation would indicate the validity of construction in accord with such intent.
One of the early cases which gave some consideration to this question was Prince v. Standard Oil Company, 147 La. 283, 84 So. 657, 658, in which the court granted cancellation. It does not appear from the opinion that the payment of the shut-in royalty provided by the lease agreement was made effective by the provisions of the lease with respect to the habendum clause.
In Gennuso v. Magnolia Petroleum Company, 203 La. 559, 14 So.2d 445, the opinion approvingly quoted the following extract from Louisiana Gas Lands, Inc. v. Burrow et al., 197 La. 275, 1 So.2d 518, 521:
"The rule which imposes the implied obligation upon a lessee to operate the leased premises to the mutual profit and advantage of both parties to the contract cannot be invoked so as to erase entirely from the contract those provisions which expressly declare that the lessee's rights shall continue so long as gas is produced in paying quantities."
The case of Risinger v. Arkansas-Louisiana Gas Company, 198 La. 101, 3 So.2d 289, 293, is of particular interest. Plaintiff's action for cancellation was opposed by defendants on the ground that they were paying a shut-in royalty and they urged that under the circumstances of the case they had not been guilty of undue or unreasonable delay in failure to connect the well to the pipeline in order to market and sell the gas. The opinion of the court, after noting the substantial expenditures made by lessees, concluded that they were equally as anxious as lessors to obtain a market for the gas in order to realize a return on their investment, and the opinion declared:
"The fact that they (lessees) succeeded in obtaining a well producing gas, entitles them, under the express provisions thereof, to continue the leases in effect by paying $200 per year until such time as the gas shall be utilized or sold off the premises and thereafter to pay the lessors one-eighth royalty on the gas sold. Due to the unusual situation which developed and, as shown by the facts and circumstances of the case, which we have already recited, it is our opinion that the defendants have not violated the provisions of the leases which require due diligence in the operation of the well."
This vexatious question has obviously presented a source of difficulty with reference to construction, application and preservation of the rights of both the parties lessor and lessee, not only to our courts but particularly to members of the Bar engaged in the practice of mineral law, and has been the subject of numerous academic discussions and comments. In IV Louisiana Law Review, 196, commenting on the work of the Supreme Court with reference to mineral rights, Mrs. Daggett made the following comment on the Risinger case:

*826 "In Risinger v. Arkansas-Louisiana Gas Company a gas well had been brought in, but due to the presence of gasoline and a large amount of salt water, the well had been capped and acreage rental payment resumed. The lessors insisted that the gas should be marketed or the lease cancelled. The court very thoroughly analyzed the problem, most of the aspects of which were purely economic, and decided that the plaintiffs were unreasonable in their immediate demands. Since the producer had spent $62,500 in the well, it was logical to assume that they were as anxious as were plaintiff's to solve the peculiar problems of the case and market the gas as soon as a reasonably priced plan of operation could be evolved. The date at which that might be accomplished appeared quite indefinite and dependent upon further development in the area, but the court pointed out that in any case the primary term of the lease had not expired; that the circumstances were better under the terms of the lease than if a dry hole had been found; and that under all the aspects there had been no violation in the `due diligence in operation' clause. The fact that plaintiffs had not received gas for domestic use was a matter of their own choice."
The article by Mr. Moses in XXIII Tulane Law Review, cited supra, also commented upon the Risinger case and in connection with his discussion of the general problem made a number of statements which we consider pertinent and quote with approval. First, with reference to the practical purpose of the habendum clause the author observed:
"Generally speaking, the habendum clause of an oil and gas lease defines the term of the present day lease. Such a clause is the direct result of a natural evolution in the methods and customs of the petroleum industry, and owes its form to two compelling ideas one concerned with the desires of the lessorthe other with the needs of the lessee. Manifestly, a landowner is unwilling to grant a mineral lease for an indefinite period of time, thereby encumbering his land with a lease that is virtually non-productive of revenue. Of course, this does not mean that the landowner is insistent that every lease must be drilled. The oil and gas industry could not survive such a Herculean task. The landowner desires the expiration of the lease in the event of either failure to develop or unsuccessful drilling. The lease must be sufficiently inviting to the lessee to induce him to risk his money, his energies and his time in a venture which, to say the least, is speculative. Its tenure, therefore, is as important to him as to the landowner.
"These desires led to the development of the habendum clause which is now a familiar part of every lease. This clause safeguarded the interest of the lessor by providing for the lease's expiration at the end of a stated term; and it protected the lessee by providing for the continuance of the lease as long as production was being obtained. A few phases of the development of the habendum clause, which is almost as interesting as the development of the modern form of lease, were mentioned in a recent article. The modern clause reads as follows:
"`Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other minerals are produced from said land or lands with which said land is pooled thereunder.'
In the absence of special provisions it is apparent that under the habendum clause the lease will terminate at the expiration of the primary term even though a well has been completed on the land capable of producing gas in *827 commercial quantities, if the lessee is unable to operate the well because of lack of market for the gas. In Smith v. Sun Oil Co. (172 La. 655, 135 So. 15 (1931); cf. Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314 (1926)) the court stated that a gas well which the lessee cannot operate is not a paying proposition for either lessor or lessee, and therefore the lease terminated because of failure to produce in paying quantities. Other cases are in accord with this result.
"To protect the lessee from the hardship of losing the lease under such circumstances, there was a departure from the general rule which makes production a condition precedent to the continuation of the lease after the primary term. The royalty clause was modified by a provision which permits the lessee to pay lessor a fixed royalty on each well which is shut-in because of lack of a market or demand for the gas. The forms of the shut-in royalty provision are as varied as the lease forms in present day use. Four typical forms read as follows:
"1. `Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50.00 per well, per year, payable quarterly, and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract.'
"2. `If while this lease is in effect, oil or gas be discovered on said land which cannot be profitably produced for lack of a market at the well or wells, Lessee may pay to Lessor $100.00 as royalty for each such well, on or before the first day of January of each year after production thereof ceases for lack of a market, until the production thereof can be profitably marketed by Lessee, and while such royalty is so paid, such well or wells shall be considered as producing in commercial quantities for all purposes hereunder.'
"3. `While gas from a well capable of producing gas only is not being sold or utilized off the premises, Lessee shall pay Lessor at the rate of $200.00 per year, payable quarterly, for such time as said gas is not sold or utilized off the premises, and upon such payment by Lessee to Lessor, it will be considered that gas is being produced from said land.'
"4. `Where gas from a well producing gas only is not sold or used because of no market or demand therefor, Lessee may pay royalty at the rate of $200.00 per well or $1.00 per acre, whichever is the greater, per year, and upon such payment it will be considered that gas is being produced within the meaning of paragraph II of this lease.'
"The justification for the inclusion of such a clause, and its sanction by the courts, grows out of the difference between oil and gas. Oil can be removed from the ground and stored in tanks, moved in trucks or pipelines or tank cars. On the contrary, the only important storage place for natural gas is one of the natural underground reservoirs in which it is found. If there is no pipeline available, it must remain in the ground. Further, the lessor is not harmed if the lessee awaits a proper market, and, in addition, is paid shut-in royalty during the waiting period. These differences were recognized in the case of Ketchum v. Chartiers Oil Co. (121 W.Va. 503, 5 S.E.2d 414 (1939)). By the insertion of the clause the lessee is given an opportunity to recover the cost of the well, which otherwise would be irrevocably lost to him.
"Of course, in order to take advantage of this clause, the well must actually be capable of producing gas in commercial or paying quantities. A *828 low pressure well, even though capable of producing an enormous quantity of gas, may not be a commercial producer.
"Because of the fairly recent origin of this clause there are few cases which have interpreted it. The courts have treated the clause as valid but have refrained from interpreting the language therein. As a result it is necessary to consider a number of problems which have no judicial solution."
The same author continued his discussion of the problem in Part II of his comment, XXVII Tulane Law Review, 478, and particularly discussed Morriss v. First National Bank of Mission, Tex.Civ.App., 249 S.W.2d 269, a 1952 Texas decision which construed the payment of shut-in royalties as preserving the rights of a lessee under the habendum clause. The Morriss case also held that shut-in payments are a substitute for production and eliminate the necessity for payment of delay rentals.
The following comment was also made by Mr. Moses in the article cited:
"Another point which has arisen since the publication of Part I of this article concerns the shut-in royalty provision which generally stipulated for a small yearly payment ranging from $50.00 to $100.00 per well, but which did not provide for the length of time the lease could be kept in force by such payments. The newer leases are more reasonable in providing that the shut-in royalty will be the same amount as the delay rentals. A shut-in royalty clause must not only adequately protect the rights of the lessee as to its investment, but also must protect the lessor in providing him an adequate recompense for the extension benefits granted the lessee. A shut-in royalty clause which stipulates for a small annual payment per well, regardless of the size of the tract under lease and which further places no time limit on the extension does not accord adequate protection to the lessor. The rights of the lessor were safeguarded in Vance v. Hurley [215 La. 805, 41 So.2d 724 (1949)] by a shut-in royalty clause which provided for $2,000.00 per well with an additional stipulation that the payments could not extend the lease for a period in excess of three years. Many forms now in use in South Louisiana provide for a shut-in payment equal to the amount of the delay rentals and limit the extension to a period of five years."
The 1960 Cumulative Supplement of Thornton Oil & Gas, Volume 1, page 165, under Section 224(a) cites cases from other jurisdictions, holding:
"* * * Where there is a discovery of gas during the primary term, the lease may be continued in effect without actual production so long as the lessee is diligent in seeking a market for the gas and there is no unreasonable delay."
The same text makes the following observation under Section 289, Volume 2, at page 11:
"There is no resulting forfeiture where lessee is unable to market production immediately on account of lack of available market or of pipeline connections, provided if by the exercise of due diligence the well is equipped and a market obtained within a reasonable time, which is determinative upon the circumstances and conditions." Citing Hanscome v. Coppinger, 183 Kan. 623, 331 P.2d 590.
Under a discussion of the construction of shut-in gas payments as royalties, the following analysis is found in the Fourth Annual Institute on Oil and Gas Law and Taxation of the Southwestern Legal Foundation at pages 46 and 47:
"The Louisiana Court in Risinger v. Arkansas-Louisiana Gas Company and the Texas Court in Shell Oil Company *829 v. Goodroe ([Tex.Civ.App.], 197 S.W.2d 395) had handed down decisions in the 1940's which, when analyzed, showed that the courts had regarded such payments as royalties, but it was not until 1952, when the case of Morriss v. First National Bank of Mission was decided that there was an authoritative holding on the point.

* * * * * *
"The San Antonio Court, speaking through Judge Pope, held that the completion of the paying gas well, which was immediately shut-in and from which no gas was sold, constituted the achievement of production under paragraph 2, the habendum clause, of the lease; that all of the incidents of the lease relative to production became operative from the time of this substitute production; and that thereafter payments under the lease were `royalties' to be paid to the participating and non-participating royalty owners, and were not `rentals'.

* * * * * *
"Further, the court said that there was here involved in legal effect a producing well `such as may hold the lease indefinitely.'
"This decision that such payments herein contemplated are `royalty' appears to be a sensible and sound one, doing justice the interpretation of the particular lease involved, and providing authoritative guideposts to the interpretation of other shut-in gas royalty provisions.'
We are particularly impressed both with the conclusions and the ratio decidendi of the case of Christianson v. Champlin Refining Company, decided by the United States Circuit Court of Appeals for the Tenth Circuit and reported in 169 F.2d 207, 209, from the opinion in which we quote the following excerpts:
"The general rule is that where production results from drilling operations and the operator is unable to market the product immediately on account of lack of an available market or of pipeline connections, no forfeiture results if, by the exercise of due diligence on the part of the operator, the well is equipped and a market is obtained within a reasonable time. (Emphasis supplied.)

* * * * * *
"It is implied in the very nature of the oil business that a reasonable time must intervene between the completion of the drilling operations resulting in production and the ability to market and sell the product of a well. What constitutes a reasonable time, of necessity, depends upon the circumstances surrounding the drilling of each well. Thus, a wildcat well, a considerable distance from pipeline connections and markets, cannot be actually produced in the sense that the product is marketed within the same length of time as a well that is close to such facilities." (Emphasis supplied.)
In Bristol v. Colorado Oil & Gas Corporation, 225 F.2d 894, the same court denied plaintiff's claim for forfeiture on the ground of lessee's inability to market gas from the leased premises, despite the lapse of almost eight years after expiration of the primary term of the lease.
The circumstances of the instant case are analogous to those involved in the cited case. The Lelong-Richardson Well No. 1 was located in a "wild-cat" area several miles distant from the nearest gas pipeline and, further, there was no market for the gas at the time of completion of the well, regardless of the existence, vel non, of pipeline facilities. The lessees were diligent in attempting to procure a market which only became probable some fifteen months after completion of the well and was not assured until approximately two years after such completion. Following negotiation of a contract for the sale of gas the lessees were prevented from continuing *830 development of the leased premises by reason of the institution of this suit for cancellation and forfeiture instituted by plaintiff-lessor.
Under the facts and circumstances narrated in this opinion we sum up our conclusions to the effect, first, that the payment of shut-in royalty on the wells drilled by lessees preserved the valid extension of the lease against forfeiture. Second, that continued development was prevented, first, by the lack of a market for gas, and, second, by the institution of plaintiff's suit. For these reasons we think the judgment ordering cancellation of the lease is erroneous.
We think it appropriate to observe that the continued validity and effect of the lease here under examination must and will depend upon lessees' future actions. In view of the existing market for gas the lessor has the right to expect and demand prompt and diligent development of the leased premises, and failure so to do will unquestionably entitle him to relief by cancellation of the lease in a future action.
Two minor points in connection with this case remain for consideration.
Plaintiff has claimed damages for the use of slush pits by defendants in connection with their drilling operations, and for damages to growing crops. We are in accord with the conclusion of the district judge that the record does not provide sufficient ground for a determination of the amount of these damages, if any, and it follows that we approve the provision of the judgment dismissing plaintiff's demands in this respect as of nonsuit.
On behalf of V. L. Salmon, one of the sub-lessees or assignees, the record supports the contention that no demand was made upon him by plaintiff, and, as a matter of fact, he reconveyed his interest to one of the other parties defendant during the pendency of this action. It follows that any judgment against the said named defendant was improper, in any event. Disposition of this particular point, of course, is comprehended in our decree and is mentioned only because it was especially urged before this court.
For the reasons assigned the judgment appealed from is annulled and set aside, and
It is now ordered, adjudged and decreed that plaintiff's demands be and they are hereby rejected, with the exception of his claim for loss of use of land damaged by defendants' operations, which claim is dismissed as of nonsuit. All costs of both courts are taxes against plaintiff-appellee.