BOLIN, Judge.
Plaintiffs, lessors, seek cancellation of a mineral lease claiming termination thereof for failure to produce oil, gas or other minerals on the land prior to expiration *229 of the primary term. From a lower court judgment refusing cancellation plaintiffs have appealed.
There is no dispute as to the basic facts, the sole issue being an interpretation of the lease in light of these facts. Plaintiffs own approximately 873 acres of contiguous land in Ouachita Parish, Louisiana. On May 3, 1954, they executed two separate oil and gas leases covering the entire tract with aggregate primary terms of five years. Prior to the lapse of the five year period, plaintiffs executed an amendment providing for a one year extension of the primary term to May 3, 1960. This amendment was conditioned upon commencement of drilling operations near, but not upon, the leased premises, on or before May 3, 1959, in default of which the lease would be null and void and the lessees would forfeit the consideration paid. In furtherance of this provision drilling of a well known as the S. D. Kennedy #1 was commenced on April 27, 1959, and completed on September 16, 1959, as a productive gas well, but was shut-in for lack of a market for the gas produced. Since the well was productive the lease covering plaintiffs’ land was thereby validated for its extended primary term to May 3, 1960.
On April 3, 1960, one month prior to the expiration of the extended term of the lease, defendants began drilling a well known as Caldwell #1 located on plaintiffs’ land and operations were continuously prosecuted thereon until June 15, 1960, at which time the well was abandoned as a dry hole. During these latter operations the Louisiana Commissioner of Conservation, on May 26, 1960, by Order No. 503, effective May 19, 1960, established drilling and production units for gas and associated liquid hydrocarbons. This order force pooled the separately owned property interest in the units so created. Approximately 123 acres of plaintiffs’ land was included in the unit for the Kennedy #1 well. After issuance of Order No. 503, defendants tendered shut-in payments, as provided for in the lease, which were refused. Subsequently, at the request of plaintiffs, defendants canceled the lease covering all acreage belonging to plaintiffs except that unitized by the conservation order, resulting in the present suit for cancellation.
The principal basis of plaintiffs’ demand is the contention that the habendum clause of the amendment is the exclusive determinant of the lease term; that the primary term of the lease, as set out in the said clause, had expired on May 3, 1960, and the subsequent unitization order, although valid, came too late to operate as an extension of that portion of the lease unitized. It is claimed the drilling clause of the lease, providing for the right to continue drilling after the primary period had expired, was only for the purpose of allowing completion of any drilling operations already commenced or to allow additional drilling within 60 days after abandonment of a dry hole. But, contend plaintiffs, during such period the lease was “dead” for all other purposes and could only be revived in its entirety by actual production under the habendum clause.
Contrary to plaintiffs’ argument defendants aver drilling operations on Caldwell '#1, commenced April 27, 1960, extended the primary term of the lease for all purposes until the well was abandoned as a dry hole. Therefore, they allege, the conservation order of unitization which became effective during the “primary term” as extended had the effect of extending the lease on plaintiffs’ land included in the unit so long as “shut-in” royalties were paid (or, as here, tendered).
The lower court, in a well written opinion, concluded that article “5” of the lease, the so-called drilling clause, was necessarily interpreted with the habendum clause and controlled the term of the lease (in its entirety) once drilling continued beyond the named date. The pertinent provisions of the amended lease are as follows:
“2. Subject to the other provisions herein • contained, this lease shall *230 be for a term of two years from May 3, 1958 (called ‘primary term’) and as long thereafter as oil, gas or other minerals are produced from said lands or land with which said land is pooled hereunder.
«3 * * *
“(c) Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50.00 per well, per year, payable quarterly, and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract.
“5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter or (if it be within the primary term) commences additional drilling operations or commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of a dry hole or cessation of production. If during the last year of the primary term .and prior to the discovery of oil, gas, sulphur or other minerals on said land lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but lessee is then engaged in drilling or .reworking operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and draining the leased premises, lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.” (Emphasis supplied.)
Inasmuch as the drilling of Caldwell #1 began in April, before the expiration of the primary term and continued without interruption until June 14, 1960, and the conservation order was issued, effective May 19, 1960, the lease was in full force and effect for all purposes and forced pooling of plaintiffs’ land in a unit containing a shut-in gas well amounted to production and effectually continued the lease upon payment of shut-in .royalties.
In the case of Delatte v. Woods, 232 La. 341, 94 So.2d 281 (1957) based on a factual situation similar to the one here under consideration, it was held:
“It is firmly established in our jurisprudence that statutory authority is granted to the Commissioner of Conservation to create drilling developmental units and to integrate various tracts of various owners contained in such units, that the orders of the Commissioner supercede, supplement, replace and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. LSA-R.S. 30:1 et seq. It necessarily follows that these orders become the law as between the parties in deter *231 mining their respective rights and obligations.
“Sec. 8(h) of Act 157 of 1940, as amended, LSA-R.S. 30:9(B), authorizes the commissioner to establish drilling units so as to prevent waste and to avoid the drilling of unnecessary wells. The unit contemplated means the maximum area that might be efficiently and economically drained by one well, the owner of such tracts to share rateably according to their ownership. Such units constitute a developed area as long as a well is located therein which is capable of producing oil or gas in paying quantities.
“The rule is too well established in our jurisprudence to require citation that the drilling and production of pil from a unitized area constitutes an exercise and user of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit.”
The lease (sec. c, supra) provided for shut-in royalty of $50 per well, per year. Nevertheless plaintiffs contend shut-in royalties are not a serious or reasonable consideration for the lease rights being held by defendants. In response to this contention the lower court cited the case of Lelong v. Richardson (La.App. 2 Cir., 1961) 126 So.2d 819, wherein this court reviewed the authorities on the subject and held that the payment of shut-in royalty preserved the valid extension of the lease against forfeiture.
It was further argued by plaintiffs the defendants failed to produce, without reasonable cause, oil, gas and other minerals within the unit. The lower court found, and we agree, that the evidence adduced in the case clearly shows at the time of drilling Kennedy #1 there were no facilities or pipe lines in that area for transmitting gas produced from the well, but arrangements were under way to transport gas from this well as from others in the vicinity.
Plaintiffs finally argue the lease was prepared by defendants and presented to the plaintiffs and was signed by them in the belief it could not be extended beyond the primary term, unless drilling operations resulted in production on the leased land; and if it is otherwise interpreted, it was error brought about by defendants’ actions.
The lower court, after commenting on the evidence adduced on this point, concluded :
“The Court feels that the plaintiffs have failed to prove that there was mutual error between the parties or that there was any error which was brought about by the actions of the defendants or any ambiguity in the contract.”
We are in accord with the findings and see no necessity of outlining the evidence to substantiate our conclusion.
For the reasons assigned, the judgment of the lower court is affirmed at appellants’ costs.
Affirmed.