658 So.2d 779 (1995)
Dorothy N. McDOWELL, et al., Plaintiffs-Appellees,
v.
PG & E RESOURCES COMPANY, et al., Defendants-Appellants.
No. 26,321-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1995.
*780 Hargrove, Pesnell & Wyatt by Joseph L. Hargrove, Jr., Shreveport, for appellants.
Bodenheimer, Jones, Klotz & Simmons by David Klotz, Shreveport, for appellees.
Before MARVIN, LINDSAY, HIGHTOWER, BROWN and STEWART, JJ.
HIGHTOWER, Judge.
This is an appeal from a judgment cancelling two oil and gas leases after the district court concluded that the lessees breached the implied covenant to diligently market production. We reverse.

Facts
By two separate contracts in 1978 and 1980, W. Howard McDowell, mineral rights owner, granted another party oil and gas leases involving approximately 133 acres in Jackson Parish.[1] Plaintiffs ("the McDowells") are successors to the original lessor, while defendants presently own all the leasehold or working interests.
*781 The McDowell No. 1 Well, drilled on one of the leased tracts, serves as the unit well for a 640-acre gas unit designated by the Louisiana Office of Conservation and encompassing all lands covered by both leases. One of the defendants, PG & E Resources Company ("Resources"), has been the operator of that well since August 1989.
Prior to March 1990, Resources and its predecessor operator combined the "wet gas" produced by the McDowell well with "dry gas" from the Breedlove No. 1 Well, located on lands not covered by the leases. This mixture met the quality standards necessary for transmission of the McDowell gas through a pipeline operated by United Gas Pipeline Company ("United Gas") for ultimate sale. In early 1990, however, when Breedlove stopped producing, United Gas refused to accept the unmixed wet gas from McDowell.
Thus, in March 1990, unable to transport and sell the McDowell gas, the operator faced a shut-in well predicament.[2] Thereafter, Resources endeavored to reestablish a market through steps that included:
 Pursuing repeated requests for United Gas to grant "liquid exceptions" that would allow transmission to be resumed through that company's pipeline.
 Striving to secure dry gas to mix, as before, with McDowell's wet gas, by engaging in reworking operations on Breedlove No. 1, from March 9, 1990 until April 3, 1990 (costing approximately $25,000), and, thereafter, recompletion operations on that same well until July 10, 1990 (costing $25,287).
 For that same purpose, on September 2, 1990, spudding Breedlove No. 2 (after staking the well in May, and then encountering site and timber removal problems) to eventually result in the abandonment of a dry hole at the end of October 1990 (costing $273,532).[3]
 Concurrently with these activities, contacting two gas carriers, Crystal Oil Company ("Crystal") and Tex/Con, about purchase arrangements despite the existence of a "buyer's market" in 1990.
 By August 1990, contemplating an agreement to sell gas from the McDowell Well and another well, Ferguson, to Tex/ Con.
 On September 4, 1990, agreeing to sell only the Ferguson gas to Tex/Con because, if the then-ongoing drilling operations for Breedlove No. 2 proved successful, no sale of McDowell gas to Tex/Con with the attendant pipeline construction expense would have been necessary.
 When the Breedlove No. 2 drilling proved unsuccessful, immediately undertaking to: (a) complete negotiations for the sale of McDowell gas to Tex/Con; (b) secure necessary pipeline rights-of-way; and (c) build the required pipeline. (Testimony indicates the Tex/Con price to have been more attractive than the Crystal offer.)
 By December 4, 1990, reaching agreement for a three-well sale of gas (including McDowell) to Tex/Con.
 On April 28, 1991, placing the McDowell Well back on line, after construction of the pipeline (costing $82,236).
In May 1991, after actual production resumed, the McDowells again began receiving royalties on the minerals sold from their property.
About one month prior to the resumption of production, however, the McDowells executed in favor of Jim C. Shows, Ltd., another lease on the same lands covered by the 1978 and 1980 contracts. In March and May 1991, considering the prior agreements no longer valid, the new lessee mailed letters demanding a release of defendants' contracts. When *782 Resources refused to comply, the McDowells brought suit seeking a judicial declaration that, as a result of a 90-day cessation of production, the two older leases had expired by their own terms. Defendants countered that these instruments remained in effect by virtue of force majeure provisions and the payment of shut-in royalties. After trial, upon discerning a breach of the implied covenant to market diligently as envisioned by Article 122 of the Louisiana Mineral Code, see LSA-R.S. 31:122, the district court ordered the two leases cancelled. Defendants now appeal, while plaintiffs answer to complain that the trial court failed to award attorney's fees and legal interest.

Discussion

I. Did the Leases Expire "By Their Own Terms?"
Plaintiffs instituted suit asserting that the leases "expired by their own terms" under Paragraph 6 thereof. Careful reading of the agreement,[4] however, does not support that proposition.
Paragraph 5 provides that, in a shut-in or force majeure situation, with the payment of shut-in royalties, the lease continues in effect during such shut-in period "as though production were actually being obtained...." The trial court found that, around March 11, 1990, when United Gas Pipeline refused to accept the "wet" gas from McDowell, a shut-in situation came into existence. Defendants, as stated, thereafter paid shut-in royalties in accordance with the contract.
In brief, plaintiffs contend that the gas purchase offers, eventually secured from Crystal and Tex/Con, contravene a finding that no market existed and preclude application of the shut-in clause. This argument, however, ignores the explicit language of the contract. According to Paragraph 5, absent the availability of a pipeline, only a market "at the well" would negate a shut-in situation.[5]
Essentially, the lease contemplates the continuous need for transporting gas from the well-head site. Thus, the wording of Paragraph 5 comports with the general concept that a shut-in provision serves to address equitably the transportation difficulties inherent in gas marketing, and, also, to balance the competing interests of the contracting parties. See Davis v. Laster, 242 La. 735, 138 So.2d 558 (1962); Lelong v. Richardson, 126 So.2d 819 (La.App. 2d Cir.1961); Acquisitions, Inc. v. Frontier Explorations, Inc., 432 So.2d 1095 (La.App. 3d Cir.1983); Nordan-Lawton Oil & Gas Corp. of Texas v. Miller, 272 F.Supp. 125 (W.D.La.1967), aff'd, 403 F.2d 946 (5th Cir.1968). Basically, because natural gas ordinarily cannot be stored upon production, a pipeline provides the only economic means of transportation. Frey v. Amoco Production Co., 603 So.2d 166, 175 (La.1992).
Both preliminary gas purchase offers (from Crystal and Tex/Con) would have necessitated that the operator construct a pipeline, and, thus, did not end the shut-in situation. Before that could occur, under Paragraph 5, the "market" had to be brought to the well. Hence, the mere existence of potential buyers within the involved area did not suffice. Moreover, Resources' efforts to connect the nearby markets to the well, including, e.g., its attempts to reinstitute the Breedlove mixing process, are more appropriately evaluated by examining the reasonableness of its business decisions in light of Article 122's implied obligation of diligent marketing. Cf. Williams and Meyers, Oil and Gas Law, § 632.4 (1993); Forbis, The Shut-In Royalty Clause: Balancing the Interests *783 of Lessors and Lessees, 67 Tex.L.Rev. 1129 (1989).
In its reasons for judgment, the trial court referred to the 90-day cessation clause enunciated in Paragraph 6 of the lease.[6] That provision applies, however, only "if production previously secured should cease for any cause...." Very importantly, in a Paragraph 5 shut-in situation, production does not "cease" but continues constructively. See Davis, supra (observing that the very purpose of a shut-in royalty clause is to maintain the lease as though the gas had not ceased flowing). Thus, the 90-day cessation of production provision never applied "by its own terms."
Neither can the Paragraph 6 provision be "transposed" or "imported" into Paragraph 5 to provide arbitrarily a 90-day limitation with respect to shut-in or force majeure situations. In Lelong, supra, this court reversed a lease cancellation where shut-in royalties had been paid for over two years. Cf. Risinger v. Arkansas-Louisiana Gas Co., 198 La. 101, 3 So.2d 289 (1941) (over two years); Bristol v. Colorado Oil & Gas Corp., 225 F.2d 894 (10th Cir.1955) (over nine years).

II. Did Resources Breach the Implied Covenant of Diligent Marketing?
The trial judge's decision did not center upon a breach of Paragraph 6, but instead essentially relied upon the diligent marketing covenant implied in all oil and gas leases. In any consideration of that general duty, the issue evolves into matters of factual circumstances, reasonable and diligent efforts, industry standards, prudent operations, etc. Cf. LSA-R.S. 31:122; Frey, supra.[7] There are few cases dealing with this obligation in Louisiana.
First of all, we agree with defendants' well-stated position that the trial court should never have reached the implied covenant question. To cancel a lease for breach of an implied covenant, the plaintiff is required to place the defendant formally in default prior to seeking judicial intervention. Hunt v. Stacy, 25,578 (La.App. 2d Cir. 02/23/94), 632 So.2d 872; Taussig v. Goldking Properties Co., 495 So.2d 1008 (La.App. 3d Cir.1986), writ denied, 502 So.2d 111 (La. 1987). Such a "putting in default" never occurred in the present case. Nor is this merely a preliminary matter to be addressed by exception prior to answer. Instead, without a putting in default, no cause of action is disclosed. Pipes v. Payne, 156 La. 791, 101 So. 144 (1924). This is especially true here, where plaintiffs' petition did not rely upon the breach of an implied covenant, thus presenting defendants with no reason, certainly no reason before answer, to raise a "putting in default" objection.
Plaintiffs' pleadings and the new lessee's demand letters merely sought cancellation and release of the leases as having expired "by their own terms." These, or similar devices, cannot substitute for a placing in default with respect to the alleged breach of an implied duty. See Hunt, supra; Taussig, supra. Furthermore, the default requirement is designed to serve two purposes in the present context: (1) To provide notice that the lessor considers the lessee's actions (or inaction) as violative of the implied obligation to market, and (2) to afford the lessee a reasonable opportunity to perform that obligation. *784 Id. Yet here, before the March demand letter, Resources had signed the gas purchase contract with Tex/Con and had measures well under way toward constructing the necessary pipeline. And, of course, before the May letter, production had actually resumed.
Even approaching the diligent marketing issue on its merits, however, the record before us still does not disclose a breach of the implied covenant. Certainly, there is no authority for simply imposing the 90-day cessation period from Paragraph 6, as did the trial judge, to fix a precise time span within which a lessee must effectuate a marketing relationship. Nor does any of the testimony concern industry standards as to what reasonably should be expected under the circumstances shown.
Under LSA-R.S. 31:122, a lessee's conduct will be evaluated by what is expected of ordinary persons of ordinary prudence under similar circumstances and conditions, having due regard for the interest of both contracting parties. Frey, supra. As explained by Kramer and Pearson, The Implied Marketing Covenant in Oil and Gas Leases: Some Needed Changes for the 80's, 46 La.L.Rev. 787 (1986), the most that can be required of a lessee (even if payment of shut-in royalties cannot hold a lease indefinitely) is an effort to market gas within a reasonable time, i.e., the lessee must conduct himself as a reasonable and prudent lessee. Also, where the interests of the lessor and the lessee are aligned, as here, the greatest possible leeway should be extended to the lessee in his decisions about marketing gas. Williams and Meyers, Oil and Gas Law, § 853, et seq. (1993).
Thus, what constitutes a reasonable time for obtaining a market, of necessity, will be measured by the operator's exercise of due diligence under the circumstances. See Acquisitions, Inc., supra; Bristol, supra; cf. Lelong, supra; Risinger, supra. Here, following the shut-in situation that developed in March 1990, Resources instituted continuous and simultaneous efforts to reestablish a market. Notwithstanding plaintiffs' arguments about self-dealing, had the reworking or recompletion of Breedlove No. 1 or the drilling of Breedlove No. 2 proved successful, McDowell gas sales could have immediately recommenced without the cost of a pipeline. Over the thirteen months in question, Resources never stopped its endeavors to resume such sales, and even pursued several avenues at great expense. Evaluating these actions in light of the existing circumstances, we cannot conclude that the operator did not act for the mutual benefit of both the lessor and the lessee. Neither can we discover any breach of the reasonably prudent operator standard. Cf. Davis, supra; Lelong, supra; Risinger, supra; Caldwell v. Humble Oil & Refining Co., 155 So.2d 228 (La.App. 2d Cir. 1963), writ refused, 245 La. 81, 157 So.2d 230 (1963); Pierce v. Goldking Properties, Inc., 396 So.2d 528 (La.App. 3d Cir.1981), writ denied, 400 So.2d 904 (La.1981); Bristol, supra.
Cancellation obviously is a harsh remedy. See Official Comment to LSA-R.S. 31:137. Consequently, the right to dissolve a mineral lease will be subject to judicial control according to the factual circumstances of each case. Taussig, supra. In order to cancel a mineral lease the breach must be shown to be substantial. Cox v. Cardinal Drilling Co., 188 So.2d 667 (La.App. 2d Cir. 1966); Taussig, supra. As observed by Kramer and Pearson, supra, at 825:
For breaches of marketing that are essentially challenges to the reasonableness of the actual marketing decision, ... only "under extraordinary circumstances" should the lessor be entitled to a decree of cancellation.... [C]ancellation ... would be too harsh a penalty for a mistake in business judgment.
In the present matter, plaintiffs have simply not shown facts warranting a cancellation. Neither is any self-dealing or fraud involved so as to call for "punishing" a wrongdoer. To the contrary, as demonstrated by the record, third parties are actually paying for this litigation in an obvious effort to supplant Resources and, in the process, inflict a substantial loss on the lessees.

*785 Conclusion
For the reasons assigned, the district court judgment is reversed and set aside, and plaintiffs' demands are now dismissed. All costs, here and below, are assessed to plaintiffs-appellees.
REVERSED.
BROWN, Judge, dissenting.
In an oil and gas lease, a lessee undertakes to manage and develop the property for the mutual benefit of himself and the lessor. Frequently, the interests of the lessee conflicts with those of his lessor. In these circumstances, the lessee must exercise its power in fairness and good faith. LSA-R.S. 31:122.
The primary purpose of an oil and gas lease is clearly to obtain production and income. Obviously, the lessee has an obligation to market the product once discovered. In fact, the lessee has a duty to obtain the best price possible. Frey v. Amoco Production Co., 603 So.2d 166 (La.1992). Ordinarily, the interests of the lessee and lessor coincide. Where the interests of the two diverge, as in this case, and the lessee lacks incentive to diligently market the gas, his business judgment must be questioned.
The majority opinion is solely premised on the factual conclusion that the shut-in provisions of the leases were applicable because there was no market "at the well." Without such a shut-in situation, the leases automatically expired with the cessation of production for 90 days. Thus, I will address the application of the shut-in clause based on the loss of market at the wellhead.
Prior to March 1990, the McDowell gas was either sold to United Gas, transported through the United Gas pipeline for sale to others, or transported through the gathering system of Crystal for sale to Highland Energy Company or others. Testimony given by a Resources manager of marketing, Bobby R. McAlpin, indicated that at the time the Breedlove well failed, United Gas was merely transporting the McDowell gas to the ultimate buyer. Thus, the key event alleged to have extinguished the market was the loss of the means to transmit the gas; however, other means for transmitting the gas were quickly identified. The Breedlove well stopped producing sometime between January and March 1990. In March 1990, United Gas informed Resources that the gas from the McDowell well did not meet the company's quality specifications. United Gas refused to accept any further production from the McDowell well. Thus, production ceased from the McDowell well.
Resources chose to solve the problem by reestablishing the dry gas production from the Breedlove well. Efforts to rework the Breedlove well commenced immediately. Resources simultaneously searched for a carrier to accept the McDowell gas in its "wet" state. On April 24, 1990, Crystal Oil Company ("Crystal") tentatively agreed to accept the McDowell gas. Resources chose, however, not to respond to the Crystal offer, hoping that the negotiations then underway with Tex/Con, another gas carrier, would produce a better price.
Efforts to rework the Breedlove well from March to June 1990 failed. Thereafter, Resources immediately began the more elaborate task of recompleting the Breedlove well. About the same time, Resources began the research necessary to identify landowners over whose property a pipeline to Tex/Con would have to be built if negotiations with that carrier were successful. In August 1990, Tex/Con tentatively agreed to accept production from various Resource wells, including the McDowell well. When an agreement with Tex/Con was finalized, however, Resources had withdrawn the McDowell well. Breedlove recompletion efforts failed in September 1990 and the Breedlove No. 1 well was abandoned. Resources chose to drill a second well on the Breedlove tract. This second well resulted in a dry hole and work on the Breedlove No. 2 well was abandoned in October 1990. The date of withdrawal of the McDowell gas from the Tex/ Con agreement coincided with the commencement of drilling of the Breedlove No. 2 well.
When the second Breedlove well failed, defendant began to take the steps necessary to complete an agreement with Tex/Con to transmit the production from the McDowell *786 well. Resources negotiated with landowners concerning rights-of-way from the McDowell well site to Tex/Con's pipeline and approved the purchase of these rights in December 1990. The numerous working interest holders, however, did not grant their approval until mid-February 1991. The rights-of-way were acquired, the feeder pipeline was built and the McDowell well resumed production in April 1991.
Royalty checks to plaintiffs had stopped at the end of May 1990. Thereafter, plaintiffs tried to contact Resources to learn why the payments had stopped; however, Resources failed to respond. When Resources tendered shut-in royalty checks in January 1991, plaintiffs again sought an explanation. In February 1991, Resources responded, explaining that it considered the wells shut-in under the terms of the leases.
Evidence shows that Resources initially pursued and remained aware of alternative means to transmit the McDowell gas to an ultimate buyer. Resources chose to devote its efforts to restoring production in an unrelated oil and gas unit in another field which benefited only Resources' interest rather than to avail itself of the means to readily restore the McDowell well to a producing status.
Resources had no economic incentive to immediately hook up the McDowell well through a feeder pipeline to Tex/Con. Resources' interest was in reestablishing production on its Breedlove lease.
Under these circumstances there was a market at the well site and the shut-in provisions were not applicable. See Logan v. Blaxton, 71 So.2d 675 (La.App. 2d Cir.1954); Woods v. Ratliff, 407 So.2d 1375 (La.App. 3d Cir.1981); Duke v. Sun Oil Co., 320 F.2d 853 (5th Cir.1963).
NOTES
[1] The parties executed both leases on M.L. Bath form Louisiana Spec. 14-BR1-2A-PX 10-65.
[2] In January (1991) of the year immediately succeeding the shut-in of the well, Resources submitted shut-in royalties to the lessors, all in accordance with the lease.
[3] In addition to the sizeable expenditures made, trial testimony reflects the considerable confidence of Resources personnel that they could reestablish production from Breedlove. Likewise, in light of a substantial earlier investment in the valuable McDowell well, Resources wanted McDowell back "on stream" as soon as possible. Testimony also indicates that, absent an effort first to reestablish Breedlove and thus save the cost of another pipeline, Resources arguably would not have acted in the best interest of the lessors or lessees of McDowell.
[4] Given that all pertinent provisions of the two documents are identical, we will frequently refer to the leases in the singular.
[5] In pertinent part, Paragraph 5 of the lease states:

If Lessee obtains production of minerals on said land or on land with which the leased premises or any portion thereof has been pooled, and if, during the life of this lease either before or after the expiration of the primary term, all such production is shut in by reason of force majeure or the lack either of a market at the well or wells or of an available pipeline outlet in the field, this lease shall not terminate but shall continue in effect during such shut-in period as though production were actually being obtained on the premises..., and [at indicated times] Lessee shall pay or tender ... to the royalty owners [the appropriate shut-in payment]. [Emphasis added.]
[6] In pertinent part, Paragraph 6 of the lease states:

This lease will continue in full force and effect within or beyond the primary term as long as any mineral is produced from said land hereunder or from land pooled therewith.... [I]f production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in drilling operations or reworking operations with no cessation between operations or between such cessation of production and additional operations of more than ninety consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. [Emphasis added.]
[7] LSA-R.S. 31:122, providing the general implied duty owed by a mineral lessee to his lessor, states:

A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.