CARAWAY, J.,
would deny rehearing.
|tI concur in the result of the majority opinion and would deny rehearing. However, the importance of the emerging issue over the lessee’s obligations for the exploration and development of a horizontal blanket formation for oil or gas hydrocarbons requires me to express my different view of the governing law and to identify *986 certain facts unexplained in the majority opinion upon which this particular case turns. Most importantly, the legal rulings do not follow the prior jurisprudence and the Louisiana law and will cloud future shale development actions by lessors against lessees.
A misnamed suspension “doctrine” is cast aside by the majority as untethered equity without any analysis of the parties’ contractual obligations in this breach of lease action. The lessee is thus admonished for “its dilatory conduct after suit was filed.”
The mineral lease is a special contract importing real rights and obligations. La. R.S. 31:114 and 31:16. Like the predial lease addressed in the Civil Code, the mineral lease is a bilateral contract where both parties obligate themselves reciprocally. La. C.C. arts. 2668 and 1908. The contract provides for a “continuous or periodic performance” so that its dissolution would fall under La. C.C. art. 2019, and a partial dissolution for the lessee’s failure to develop a formation or formations would be expected. La. C.C. art. 2019; La. R.S. 31:142. With this breach of contract action, the mineral lessor’s correlative obligation, as set forth in the Mineral Code and now implicated, is his duty “to refrain from disturbing the lessee’s possession.” La. R.S. 31:119. The lessor warrants the use and peaceful ^possession of the lease premises and is bound to deliver those premises for use by the lessee. Id. If the lessor is wrong about the lessee’s breach, the lessor’s suit is a violation of his duty to refrain from disturbing the lessee’s possession. The remedy for such a violation by a lessor, assuming the claim for dissolution was made in good faith, is to delay the lessee’s obligation for continued performance until the suit has ended.
This warranty concept was involved in the early ruling in Smith v. Kennon, 188 La. 101, 175 So. 763 (1937) where the mineral lessee sued the lessors after the lessors’ execution of a top lease to another party. Finding a viable cause of action, the court ruled:
The landowners, by a subsequent lease contract having granted identical rights to another, have, in effect at least, said to plaintiff that they are no longer obligated to him and will not permit him to exercise the right which he claims. By making the second lease, they have repudiated their contract with plaintiff. Plaintiff, therefore, has a personal action against the landowners to have it judicially determined whether or not his lease contract is still in full force and effect.
Id. The lessee’s rights which the lessors would not permit were the possessory rights to the premises for the exploration and production of minerals. His lease title was repudiated and development of the lease under that cloud was out of the question. If the granting of a top lease is an informal repudiation, the lessor’s filing of a suit for dissolution of the lease is a formal repudiation, placing the continuous performance obligations of the lessee in jeopardy.
This court’s ruling in Lelong v. Richardson, 126 So.2d 819 (La.App. 2d Cir.1961) directly addressed the lessee’s obligation for continued development of the lease in the face of the lessor’s suit for lease | .^cancellation. The court held “that continued development was prevented, first, by the lack of a market for gas, and second, by the institution of plaintiffs suit.” Id. at 830. Although a discussion of legal principles was not given in Lelong, the common sense principle is that a mineral lessee can hardly be expected to attempt to enter the lease premises and expend the large investment of an oil and gas well while the lessor is insisting in a pending lawsuit that *987 the lease has ended by the lessee’s prior failure to act. Such lawsuit is a refusal of the lessor to perform his obligation “to deliver the premises that he has leased for use by the lessee.” La. R.S. 31:119. In this bilateral setting, the lessee cannot render performance faced with the lessor’s refusal to perform.
The above analysis is not a “doctrine” gleaned from mere equity. It does not concern suspension of prescription, as no servitude theory is involved. It is an analysis of the parties’ bilateral relationship in a lease contract requiring a continuous performance by both. It was articulated precisely by the Supreme Court in Perkins v. Long-Bell Petroleum Co., 227 La. 1044, 81 So.2d 389 (1955), as seen by the quote from that case cited by the majority and then ignored. It was applied by this court in Lelong. Finally, with the Mineral Code’s express statement of the lessor’s obligation to deliver the use and peaceful possession of the lease premises, this basic analysis of the parties’ bilateral obligations is not altered in any manner by that Code.
With this mistaken discarding of established law, the majority then proceeded with a confusing discussion over the relevant and irrelevant | ¿evidence for the measure of a reasonably prudent operator in this case. Since Questar was prevented from developing plaintiffs property after the filing of this suit in October 2008, it does not matter that a reasonably prudent operator should have drilled a Haynesville Shale well affecting plaintiffs property in 2009 or by the time of trial. When the evidence is detailed further, that is all that the plaintiffs evidence tended to prove.
The majority opinion references 150 Haynesville Shale wells without identifying the time period for the drilling and completions for those wells and the well locations in relation to the plaintiffs property. The plaintiffs brief for rehearing summarizes these 150 wells as located within a “nine-township area surrounding the plaintiffs property,” where those wells were permitted, drilled and/or completed by twelve other operators from March 2008 until the time of trial in May 2010. Within this huge 324 square-mile area covering over 200,000 acres in multiple parishes, the first well which plaintiff argues as relevant to his claim was permitted by the Office of Conservation in Section 17, Township 12 North, Range 14 West, some four miles away from the plaintiffs tract in Section 22, Township 12 North, Range 15 West. The permit for that well was issued on October 6, 2008, only four days before the institution of this suit. That well is the only well permitted before the filing of this suit which plaintiff asserts as indicative of Questar’s failure to develop his property. Yet, that well was not completed until January 2009. The other 15 nearby wells (out of the 150), which plaintiff argued at trial and on rehearing, were all permitted and drilled after the filing of suit.
| sFrom this crucial well data, plaintiffs demand for a breach of the lease occurred in August 2008 when no other operator had successfully completed and produced a Haynesville Shale well in the vicinity of plaintiffs property. Questar was charged by plaintiff for its failure to perform as a reasonably prudent operator when no other operator had yet demonstrated an established productivity of the formation with an economic return in any well nearby. Without any nearby example of a Haynesville Shale test, this is not the case for any “Haynesville exception” to the measure of the development obligation of the reasonably prudent operator which plaintiff urges.