396 So.2d 528 (1981)
Joseph Maxie PIERCE, Plaintiff-Appellant,
v.
GOLDKING PROPERTIES, INC., Defendant-Appellee.
No. 8125.
Court of Appeal of Louisiana, Third Circuit.
March 11, 1981.
Writ Denied May 18, 1981.
*529 Broussard, Broussard & Moresi, Marcus A. Broussard, Jr., Abbeville, for plaintiff-appellant.
Gordon, Arata & McCollam, John M. McCollam, New Orleans, for defendant-appellee.
Before GUIDRY, CUTRER and LABORDE, JJ.
GUIDRY, Judge.
In this suit the plaintiff-lessor, Joseph Maxie Pierce, seeks damages and cancellation of an oil, gas and mineral lease held by the defendant-lessee, Goldking Properties, Inc. (hereafter Goldking). In support of his demand plaintiff contends that Goldking breached its contractual obligations under the lease in failing and refusing to pay him royalties on pre-unit production resulting from a lease well situated on the property of an adjacent landowner; and, in failing to protect his land from uncompensated drainage. Plaintiff further urges that the defendant had an obligation to represent the lessor fairly and completely before the Commissioner of Conservation and failed to do so. The defendant filed a dilatory exception of prematurity grounded upon plaintiff's failure to place the defendant in default prior to the filing of the instant suit as required by La.R.S. 31:135 and 136, infra. Defendant's exception was referred to the merits by the trial court. The trial court held that Goldking acted reasonably and prudently in its dealings with the plaintiff *530 and denied plaintiff's demands. Plaintiff appeals from that judgment. We affirm.

FACTS
The facts of the instant case are undisputed. On November 13, 1973, plaintiff entered into two mineral lease agreements with J. W. Rettig, Jr. Through a series of assignments, these leases were ultimately acquired by the defendant, Goldking. On or about August 21, 1974, Goldking drilled and completed a gas well, referred to as the Bernard No. 1 well, which was physically located on land owned by Raywood Bernard et al., which lands are situated adjacent to the lands owned by the plaintiff.[1] The well was initially shut-in because of non-availability of a reasonable market. Approximately one month later, Goldking retained the services of Ted Hoz, a consulting geologist, for the purpose of determining the advisability of creating producing units for the productive sands found in the Bernard No. 1 well. At some time in late December 1974 or early January, 1975, Mr. Hoz advised Goldking to file an application with the Commissioner of Conservation requestion the creation of drilling and producing units for the Siphonia Davisi No. 3 Sand (referred to as SD-3) and the shallower Cristelleria No. 6 Sand (referred to as Crist-6) pursuant to the provision of LSA-R. S. 30:9. On January 4, 1975 Goldking filed its initial notice of intent to apply for the aforementioned units. Subsequently, a pre-application hearing was scheduled for February 4, 1975 to be held in Lafayette, Louisiana. Following the pre-application hearing, on February 7, 1975, Goldking filed its formal application for a public hearing before the Commissioner of Conservation. The Commissioner set the hearing for April 8, 1975, thus, allowing sufficient time to provide the thirty day public notice and advertisement as mandated by statute.
While the aforesaid unitization procedure was ongoing, defendant was actively engaged in the search for a reasonable market for the gas to be produced from the Bernard No. 1 well. On February 16, 1975, after a market was located, the Bernard well was put on production. All lease royalties resulting from the gas produced from the subject well were paid to Raywood Bernard et al. Subsequently, the public hearing, scheduled by the Commissioner, was held resulting in the issuance of Department of Conservation Orders Nos. 367-D1 and 367-E which created producing units for the SD-3, Reservoir B, and the Crist-6 Sand, Reservoir B, as requested by the defendant. These units included substantial portions of the plaintiff's lands which were leased to defendant. The Commissioner of Conservation, despite opposition, set the effective date of the unitization order as May 1, 1975. Commencing as of that date, royalties were ultimately paid to those lessors who contributed lands to the aforesaid units, including plaintiff.
On or about June 25, 1975, Pierce, through his attorney, wrote J. W. Rettig, Jr. stating his concern that he had not received any royalty payments despite information indicating that his leased lands were included within the confines of a producing unit. On June 30, 1975, W. E. Pittman, Exploration Land Manager for Goldking, responded to plaintiff's inquiry that royalty payments would be forthcoming following the Commissioner of Conservation's approval of the preliminary survey of the subject unit and completion of title examinations on each unit tract. On July 2, 1975, plaintiff's attorney in a letter to Mr. Pittman expressed for the first time his contention that plaintiff's royalty should be computed and paid from the date of first production of the Bernard No. 1 well. Mr. Pittman replied that plaintiff would receive all royalties due from the effective date of the unit. On October 27, 1975, plaintiff in a letter to Goldking officials expressed his intent to seek cancellation of the oil, gas and mineral lease applicable to his lands unless royalties were paid to plaintiff dating *531 from the time of first production of the Bernard No. 1 well, i. e., February 16, 1975. On November 11, 1975, plaintiff's counsel sent a letter to counsel for the defendant which contained plaintiff's allegations that Goldking was guilty of failing to protect plaintiff's lands from drainage. Goldking refused to tender royalty payments as requested by the plaintiff, thereafter the present litigation ensued.
Plaintiff-appellant specifies as error the holding of the trial court that he is not entitled to royalty payments for alleged drainage of his lands resulting from pre-unit production obtained from a lease well located on the property of an adjacent landowner. In addition, appellant urges that the trial court erred in failing to hold that the defendant breached its obligation to represent the plaintiff's interests before the Commissioner of Conservation.
As we understand appellant's principal argument, he contends that the defendant, Goldking, was obligated to delay production of the Bernard No. 1 well until unitization of the lands subject to the oil, gas and mineral leases at issue or pay him for the pre-unit production allocable to the unitized portions of his leased lands, and when it failed to do either, the lessee breached its obligation under the leases to protect the leased lands from drainage. Considering the provisions of the leases in question, specifically paragraph 5 thereof,[2] and mindful of the sequence of events as disclosed by the record as well as the custom and practice of the mineral industry, we conclude that Goldking acted at all times as a reasonable and careful operator and did not breach its obligation to protect the leased land from drainage.
Louisiana R.S. 31:122 provides the duty owed by the mineral lessee to the lessor, to-wit:
"A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee."
The redactors of Louisiana's Mineral Code in the official comment to Article 122 clearly express the intent of the article in regard to diligence in marketing, viz:

"Diligence in marketing: A mineral lessee is under a duty to exercise reasonable diligence to secure a market for minerals that have been produced or are capable of being produced in paying quantities. There is rarely a problem in this regard where oil is being produced, as ready markets can usually be found. Most problems arise in connection with the marketing of gas where the magnitude of reserves has not been proved, a market is not readily available, marketing facilities are not available, or administrative delays are involved. The existence of an obligation to exercise reasonable diligence in securing a market is recognized in the Louisiana jurisprudence. See e. g. Risinger v. Arkansas-Louisiana Gas. Co., 198 La. 101, 3 So.2d 289 (1941); Hutchinson v. Atlas Oil Co., 148 La. 540, 87 So. 265 (1921); Lelong v. Richardson, 126 So.2d 819 (La.App.2d Cir. 1961)."

As previously stated, the Bernard No. 1 well was drilled and completed on August 21, 1974, however, was initially shut-in due to the non-availability of a reasonable market. Expert witness, Henry Speyrer, a petroleum engineer testified that the longer a well is shut-in the greater the likelihood of operational difficulties when the well is finally placed on production. Mr. Speyrer also stated that the most prudent course of *532 action to take in such situations is to place the well on production as quickly as possible to avoid damage. Furthermore, the record reveals that during the time that Goldking was attempting to locate a suitable market for the gas, it continued to proceed with its efforts to unitize the lands surrounding the Bernard No. 1 well.
On or about December 11, 1974, Goldking located a reasonable market for the gas and after the requisite negotiations, finalized the marketing agreement. Following the construction of the flow line facilities necessary to accommodate the marketing of the gas, initial production was commenced on February 16, 1975. It is clear from the language of LSA-R.S. 31:122 as well as the comments of the redactors that Goldking was obligated to the Raywood Bernard et al. lessors to commence production of the Bernard No. 1 well as expeditiously as possible. To do otherwise would have subjected the defendant to possible legal action resulting in the cancellation of the lease agreement between the defendant and the Bernard lessors.
We agree that Goldking had an obligation under the lease in question to protect plaintiff's lands from drainage, however, we conclude that it did not breach this obligation by placing the Bernard No. 1 well on production in February of 1975.
Although paragraph 5 of the aforesaid lease (see footnote 2) provides that the lessee will, under the circumstances specified, drill a well with reasonable diligence on the leased lands to protect the land from drainage, clearly this obligation is satisfied when the property is unitized by the Commissioner of Conservation, as unitization insures to each unitized tract its just and equitable share of the minerals contained in the reservoir. The record reflects diligence and conscientious effort on the part of the defendant in obtaining the approval of the Commissioner of Conservation for a drilling and producing unit encompassing plaintiff's leased land. The administrative procedures required for unitization were begun prior to the Bernard No. 1 well being placed on production and were continued with all deliberate speed until receipt of the Commissioner's order declaring the effective date of the unit as May 1, 1975. Testimony received at trial indicated that in or about September, 1974, Goldking retained the services of a consulting geologist, Ted Hoz, to ascertain the advisability of creating a unit encompassing the lands surrounding the lease well. At some time in late December or early January, Hoz recommended that such a unit be formed to prevent waste and to avoid the drilling of unnecessary wells. Upon receipt of Hoz's recommendation Goldking promptly initiated measures to insure the fulfilment of its obligations to all concerned by proceeding to obtain the approval of the Commissioner of Conservation for the creation of the unit. Thus, we conclude that the record clearly reflects that Goldking acted reasonably and prudently in regard to all of its lessors when it placed the Bernard No. 1 well on production and simultaneously proceeded diligently with its efforts toward unitization of the lands surrounding the Bernard well.
We note, however, that had there been such a breach, the plaintiff failed to place the defendant in default, a prerequisite to any demand for damages and/or cancellation of a mineral lease based upon a claim of uncompensated drainage.
Louisiana R.S. 31:135 and 136 set forth the requirement that mineral lessees be placed in default as a prerequisite to a demand for damages arising from drainage of the property leased. These articles provide:
Louisiana R.S. 31:135 provides:
"The provisions of the Louisiana Civil Code concerning putting in default are applicable to mineral leases subject to the following modifications."
Louisiana R.S. 31:136 provides:

"A putting in default is a prerequisite to a demand for damages arising from drainage of the property leased. If a lessee is found to have had actual or constructive knowledge of drainage and is held responsible for consequent damages, *533 the damages may be computed from the time a reasonably prudent operator would have protected the leased premises from drainage. In other cases they may be computed only from the time of the putting in default."

In addition, paragraph 11 of the oil, gas and mineral leases which forms the basis for the present litigation contains the following language:
"In the event Lessor at any time considers that operations are not being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if legally required to conduct operations in order to maintain the lease in force, shall have sixty (60) days after receipt of such notice in which to commence the necessary operations to comply with the requirements hereof."
Following the decision of the U.S. Fifth Circuit Court of Appeals in Williams v. Humble Oil and Refining Co., 432 F.2d 165 (5th Cir. 1970), there existed some controversy regarding the requirement of putting a mineral lessee in default prior to a demand for damages resulting from uncompensated drainage of the leased premises. In Williams, supra, the Fifth Circuit held that drainage by a common lessee of adjoining tracts was, as a matter of law, an active breach of the lease, thus, no putting in default was required. However, as explicitly stated in the Official Comment following La.R.S. 31:136, it is the intent of Article 136 to overrule the Williams case insofar as it relieves the lessor of the necessity to put the lessee in default.
The record in the instant suit contains voluminous correspondence between the parties to this suit and/or their legal representatives. A careful examination of these letters reveals that the plaintiff made no mention of the alleged drainage of his property until after the creation of units surrounding the Bernard No. 1 well. Thus, at the time of plaintiff's initial complaint of drainage the unit had already been in effect and all of plaintiff's productive lands were included therein and plaintiff was receiving the royalties due him. The Commissioner of Conservation's order declaring the unitization of the subject lands went into effect on May 1, 1975. Therefore, any notice of defective performance of the lease by the defendant pertained to that which had already been remedied by the Commissioner's order. Thus, we fail to discern any timely attempt by the plaintiff to place the defendant in default with respect to the alleged drainage of plaintiff's lands as required by the applicable statutes and the contractual agreement between the parties. We do not mean to imply by this decision that the remedy of damages and dissolution is not potentially available to the lessor of a lease which has not been adequately protected by the lessee from uncompensated drainage. However, we conclude that under the facts of the instant case, the defendant acted as a reasonably prudent operator and with all due diligence in its efforts to protect the leased premises. LSA-R.S. 31:122; Breaux v. Pan Am. Petroleum Corp., 163 So.2d 406, writ denied 165 So.2d 481, 246 La. 581.
The trial court held that all royalty payments on pre-unit production obtained from the Bernard No. 1 well were legally owed by the defendant to the Raywood Bernard et al lessors because the well was physically located on the Bernard tract. Thus, all production from that well had to be allocated solely to the lease on which the well was situated. Mr. W. E. Pittman, Exploration Land Manager for Goldking, testified that all royalties on such pre-unit production were paid to the lessors of the Raywood Bernard tract. Plaintiff contends that royalties on such pre-unit production should have been paid to him since allegedly a portion of such production was the result of drainage of plaintiff's lands. We conclude that such a result would not only be inconsistent with the rule of capture and the concept of unitization but also in conflict with the present jurisprudence.
Under Louisiana's so-called "rule of capture" a landowner is not the owner of minerals beneath the surface of his lands, but rather has only the right to search for *534 and draw minerals through the soil and thereby become the owner thereof. Desormeaux v. Inexco Oil Co., 298 So.2d 897 (La.App. 3rd Cir. 1974), writ refused 302 So.2d 37 (1974); Breaux v. Pan Am. Petroleum Corp., supra.
In Desormeaux supra, this court addressed a claim by a landowner similar to that of the instant plaintiff. In that case, the plaintiff-lessor sought a judgment decreeing that his unleased acreage, included within a unit, was entitled to share the production obtained from the unit well from the date of completion, as though the unit had been effective on the date the well was completed. This court in rejecting plaintiff's demand stated:
"... The landowner is not the owner of the oil and gas beneath the surface of his land. Plaintiff merely had the right to search for and reduce to possession the oil and gas beneath the land. Plaintiff has granted, under the terms of the lease to defendant, the right to search for, drill and produce oil and gas from the property covered by the lease. Under the terms of the lease, production obtained through the well drilled on plaintiff's land is owned by the lessee, subject to the 1/5 royalty which was paid to plaintiff.
We are cognizant that the rule of capture has been modified in this state by the Conservation Statute LSR-R.S. Title 30. Under the authority granted to the Commissioner of Conservation a drilling unit or units may be established for each pool for the prevention of waste and to avoid the drilling of unnecessary wells. A drilling unit is the maximum area which may be efficiently and economically drained by one well. The Commissioner is authorized to utilize geological and engineering evidence to establish the just and equitable share of the production of the unit for each tract. LSA-R.S. 30:9.

The creation of a drilling unit modifies the rule of capture only to the extent that the Commissioner's finding indicates unitization should reasonably insure each tract will receive its just and equitable share of reservoir content. Until such time as a unit is created, no other tract is entitled to production from a well. Unitization prevents the drilling of unnecessary wells to capture the oil from the reservoir." (Emphasis ours)

The plaintiff herein, as in Desormeaux, supra, alleges that he is entitled to share in the production of the lease well prior to the creation of the unit which subsequently included his lands. We disagree. Application of the Desormeaux rationale to the facts of this case clearly results in a denial of plaintiff's demands. As noted by the Desormeaux court, unitization modifies the rule of capture only to the extent that the Commissioner of Conservation determines that unitization is necessary to insure that each tract will receive its fair share of the reservoir content. No tract is entitled to share in production until the unit is created. This result is not changed merely because the mineral lessee is lessee of both the tract on which the well is physically located and the tract or tracts adjacent thereto. See Breaux v. Pan Am. Petroleum Corp., supra. Although drainage of plaintiff's lands may have occurred during the relatively short span of time between initial production of the Bernard No. 1 well and unitization, plaintiff is still not entitled to receive royalties until such time as the effective date of the unit. Desormeaux v. Inexco Oil Co., supra. Once Goldking drilled and completed the Bernard No. 1 well, the rule of capture became applicable.
Finally, plaintiff alleges that Goldking breached its obligation to the plaintiff by failing to request that the effective date of the unit be the date of the public hearing, specifically April 8, 1975, rather than May 1, 1975, the date selected by the Commissioner. Plaintiff's contention constitutes a collateral attack on an order issued by the Commissioner of Conservation which is prohibited. See, e. g., Simmons v. Pure Oil Co., 241 La. 592, 129 So.2d 786 (1961); Mayer v. Tidewater Oil Co., 218 F.Supp. 411 (W.D.La.1963); and Savoy v. Tidewater Oil Co., 218 F.Supp. 607 (W.S.La.1963), aff'd, 326 F.2d 757 (5th Cir. 1964). Orders by the Commissioner can *535 only be attacked via a direct action filed against the Commissioner in East Baton Rouge Parish. LSA-R.S. 30:12.
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to the plaintiff-appellant.
AFFIRMED.
NOTES
[1] Plaintiff's lands located adjacent to the Bernard property are the properties affected by the two Rettig leases.
[2] Paragraph 5 of the lease reads as follows:

"If, prior to or after the discovery of oil on the lands held hereunder, a well producing oil in paying quantities for thirty (30) consecutive days is brought in on adjacent lands not owned by the Lessor and not forming a pooled unit containing a portion of the lands described herein, and within 330 feet of any line of the land held hereunder, Lessee, in order, to maintain the rights granted, shall thereafter begin and prosecute with reasonable diligence the drilling of the a well in an effort to discover oil thereby and to protect the land held hereunder from drainage."