ALFORD, Judge.
The defendant lessee, Exxon Corporation (Exxon) appeals the trial court’s action granting the plaintiff lessor’s motion for summary judgment which ordered Exxon to release a portion of the leased acreage. In dispute is a forty-five acre tract.
According to the uncontested facts, the plaintiff lessor, Miami Corporation (Miami) granted Exxon a mineral lease on January 4, 1980, covering more than 2000 acres in the Bayou Carlin Field in St. Mary Parish. The lease had a primary term of three years. Included in the leased acreage were two units that had been created by the Commissioner of Conservation (commissioner) on September 4, 1968: MA-7 RB SUA and MA-7 RB SUB. There had been no production from these units since before October 1, 1977. In early 1982, Exxon began drilling a well within the physical boundaries of MA-7 RB SUA. That well, originally designated as the Miami Corporation V-2 Well (V-2 well), was completed as a gas well on October 12, 1982.
*41 CHRONOLOGY OF EVENTS
The property in question in the instant suit is forty-five acres located in the unit MA-7 RB SUB, rather than in the unit MA-7 RB SUA, on the day the well was completed. Exxon admits that no further drilling or reworking operations were undertaken. Pursuant to a request from Exxon, dated October 19, 1982, the commissioner held a public hearing on November 17, 1982, and issued Order No. 470-0-9 which authorized Exxon to utilize the V-2 well as the substitute unit well for the existing unit MA-7 RB SUA. On November 23, 1982, Exxon notified the commissioner, and all interested owners and represented parties, that Exxon intended to apply for dissolution of the existing units, MA-7 RB SUA and MA-7 RB SUB, and for formation of a new unit, MA-7 RA-1 SUB, composed of approximately 219 acres. These 219 acres consisted of approximately 174 acres in the existing unit MA-7 RB SUA and 45 acres in the existing unit MA-7 RB SUB. Exxon stated that this action was being taken because new geological data revealed that the V-2 well was producing from the RA-1 reservoir rather than the unitized RB reservoir. On December 8, 1982, having received no response or objection from any source, including Miami, Exxon filed its formal application for the formation of the unit and the dissolution of the existing units. Thereafter, Exxon requested and was granted a production allowable on the V-2 well based on the boundaries of the existing MA-7 RB SUA unit. Approximately six weeks later, by letter dated February 3, 1983, Exxon asked to have the allowable for the V-2 well cancelled as the substitute well for the MA-7 RB SUA unit and to have a new allowable issued for the well as a lease well, based on the productive acreage plat which contained the same acreage as the proposed MA-7 RA-1 SUB unit. The commissioner complied and issued an authorization fixing a new allowable based on Exxon’s request, dated February 9, 1983.
In a letter dated February 26, 1983, Miami made demand upon Exxon for a partial release of all portions of the leased premises outside of the boundaries of the MA-7 RB SUA unit. Following a public hearing on March 2, 1983, the commissioner issued Order No. 540-C-10 which dissolved the two existing RB units and established the RA-1 unit as requested by Exxon, effective as of the hearing date. Thereafter, on April 15, 1983, the commissioner revoked the February 9 allowable and reinstated the MA-7 RB SUA allowable stating that this allowable should have been in effect until the dissolution of the unit on March 2, 1983. In May, Exxon attempted to release the leased acreage to Miami except for the acreage contained in the newly created unit. Included in the retained acreage were the forty-five acres in dispute. On June 14, 1983, Miami filed the instant suit, seeking to have the lease terminated as to all acreage outside the old MA-7 RB SUA unit as it existed on February 10, 1983, to have Exxon account to Miami for all production attributable to the forty-five acres in dispute and to have Exxon pay for all costs, expenses and legal interest. The matter came before the trial court on cross motions for summary judgment. After considering the memoranda, affidavits and exhibits and hearing the arguments, the trial court ruled in Miami’s favor.. We agree.
LEASE PROVISIONS
Both parties to the lease in question are extremely knowledgeable about mineral leases. Contained in the lease drawn up by Miami are the provisions in Paragraph Fourth that:
(I) After discovery of oil, gas or other hydrocarbon upon the leased premises (during or after the Primary Term) Lessee shall ... conduct drilling or reworking operations upon the leased premises, with not more than one hundred twenty (120) days elapsing between cessation of actual drilling or reworking of one well and the beginning or actual drilling or reworking of another.
******
(III) In the event Lessee shall fail or cease to conduct drilling or reworking operations on the leased premises as *42 above provided, this lease and the rights of Lessee hereunder shall ipso facto terminate without notice, demand or putting in default, as to all portions of the leased premises except those portions, if any, which Lessee may be permitted to retain under Paragraphs EIGHTH (II) or (III) hereof, whichever is applicable; and Lessee shall promptly deliver to Lessor a suitable, recordable release.
The lease, in Paragraph Eighth provides, in pertinent part, that:
(I) If, while this lease is in force, Lessee should default in the performance of any obligation hereunder, as a condition precedent to Lessor bringing suit, Lessee shall be notified in writing of the facts relied upon as constituting a breach, and Lessee, if in default, shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of the lease....
(II) In case of cancellation or forfeiture of this lease ... Lessee may ... retain each well producing, being worked on, or drilling, in compliance with the terms of this lease, together with ... one hundred sixty (160) acres if it be a gas well, or such larger or smaller acreage around same as may, at the time of such cancellation or forfeiture, be allocated thereto as a drilling unit or required in order to produce its full allowable, under any state or federal law, order, rule or regulation_(emphasis ours)
Since no further drilling or reworking operations were undertaken, both parties agree that February 10, 1983, is the date representing 120 days after the cessation of drilling activities.
RETAINED ACREAGE
Exxon contends that the lease was maintained as to all of the leased land because gas was being produced from the leased acreage prior to expiration of the primary three-year term. However, Paragraph Fourth (I) clearly states that once gas has been discovered, as in this case, the lessee must begin additional drilling or reworking operations within 120 days after the cessation of actual drilling or reworking of a well. Since Exxon admits it did not begin any drilling or reworking operations on the leased premises before February 10, 1983, the lease itself provides that the rights of Exxon terminated as of February 10, 1983, except as to a certain amount of acreage around the producing well. Thus we are faced with determining the amount of acreage retained by Exxon, according to the lease provisions.
Alternatively, Exxon alleges that it had sixty days after February 10, 1983, to cure any alleged default, relying on Paragraph Eighth (I) as set out previously herein. Exxon contends that since the unit was created on March 2, 1983, well within sixty days after February 10, Exxon retained all land contained in the newly formed unit. This claim is without merit. The lease in Paragraph Fourth (III) provides that the lease terminates without notice, demand or putting in default 120 days after cessation of drilling operations. The provision of Paragraph Eighth simply means that Miami could not file suit to require delivery of a recordable release of the leased premises until sixty days after it had made formal written demand for the release. Since Miami made formal demand on Exxon for a partial release on February 26, 1983, and did not file suit until June 14, 1983, Miami complied with the lease requirements.
Exxon also claims that the February 9, 1983, allowable authorization issued by the commissioner under Statewide Order No. 29-F entitled Exxon to retain the 217 + acres, including the forty-five acres in dispute, even if the rest of the lease was cancelled February 10, 1983, for failure to conduct drilling operations. Exxon argues that the February 9 authorization satisfied the Paragraph Eighth (II) lease requirements as to retainage of acres “required in order to produce its full allowable, under any state or federal law, order, rule or regulation.” However, the commissioner retroactively revoked the February 9, 1983, allowable authorization on April 15, 1983. The April 15 authorization nullified the February 9 allowable and reinstated the original allowable issued for MA-7 RB SUA until that unit was dissolved on March *43 2, 1983. Under Louisiana law, application of the rule prohibiting “collateral attack” upon an order or action of the Commissioner of Conservation extends to suits between private parties in which a particular order of the commissioner is an operative fact upon which determination of the parties rights directly depends. LSA-R.S. 30:12. Trahan v. Superior Oil Company, 700 F.2d 1004 (5th Cir.1983). The commissioner was not included in this suit. Thus, Exxon’s contention constitutes a collateral attack on an action taken .by the commissioner (the April 15, 1983, authorization) which is prohibited. Pierce v. Goldking Properties, Inc., 396 So.2d 528 (La.App. 3d Cir.1981), writ denied, 400 So.2d 904 (La.1981). Since Exxon cannot look to the February 9 authorization to establish retained acreage, the property that Exxon keeps, in accordance with the lease provisions, is that “allocated thereto as a drilling unit,” which in this case is unit MA-7 RB SUA as it existed on February 10, 1983.
CONCLUSION
Por the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Costs of this appeal are to be borne by Exxon.
AFFIRMED.